**FILED**

NOV 2 8 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**IN THE U.S. DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**- DEL RIO DIVISION**

| | |
|---|---|
| JOHN J PALMER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DANIEL ESQUIVEL, third-party in his | ) |
| individual capacity, | ) |
| | ) |
| A. GARCIA, JR., in his official | ) |
| and individual capacities, | ) |
| | ) |
| A. GONZALEZ, in his official | ) |
| and individual capacities, | ) |
| | ) |
| JOHN DOE (2), in their official | ) |
| and individual capacities, | ) |
| | ) |
| CITY OF EAGLE PASS, TEXAS, | ) |
| Municipality and Corporation. | ) |
| Defendants. | ) |

**JURY TRIAL DEMANDED**

Cause No. 2:23-CV36-AM-JAC

## ORDERED AMENDMENT TO PLAINTIFF'S PETITION

NOW COME PLAINTIFF John J Palmer, acting Pro Se, for his claims against Defendant Officers Abel Garcia, Jr., A. Gonzalez, two John Does and the City of Eagle Pass, Texas for depriving the Plaintiff of his civil rights under 42 U.S.C §§ 1981, 1983, the 4th and 14th Amendments to the U.S. Constitution. We converge here, wherewith defendant counsel has filed a Motion to Dismiss for lack of subject-matter jurisdiction FRCP 12 (b) (1) and for failure to state a claim FRCP 12 (b) (6). The plaintiff has immediately amended his petition as allowed by Local Rules CV-15 in response to the defendant's MTD.

Plaintiff would ask the court to consider that the third-party 911 caller, Daniel Esquivel, as "anonymous" Also, defense counsel attempted to service him as well, but the failure by the defense counsel in successfully joining a party as per FRCP 19 (a) (1) (A) or considering even the lack of availability to interrogate Mr. Esquivel as to the details in him calling 911, may prejudice the plaintiff, and will not accord complete relief between parties to establish sufficient subject-matter jurisdiction. The plaintiff has since served defendant Esquivel through server. This information is vital in determining if reasonable suspicion existed!  An Order by Court Magistrate judge, denying the defendant's MTD, has since been received dated **11-13-2023**.

## SYNOPSIS

This is an action for money damages and injunctive relief brought pursuant to 42 U.S.C. §§ 1981, 1983, and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and under the color of law of the State of Texas, against Officer A. Garcia, Jr., A. Gonzalez and two Officer John

Does, and officers of the City of Eagle Pass, in their individual and official capacities and against the City of Eagle Pass.

Plaintiff John J. Palmer alleges that Defendants Garcia, Jr., Gonzalez, Does, and Daniel Esquivel made an unreasonable search and seizure of his person, used Excessive force, imprisoned him by stopping him, and physically assaulting him without cause. Plaintiff alleges that these constitutionally protected Federal and State violations were committed because of the policies, practices, and procedures of the City of Eagle Pass, and that the City of Eagle Pass is liable under theories of Monell for the injuries and violations to Constitutional rights committed by Defendants. Plaintiff requests that bifurcation of trial be made for Monell Liability claims.

Violations were performed with Malicious Intent and Prosecution and resulted in Intentional Infliction of Emotional Distress should be allowed procedural due process for violating 4th, 5th & 14th amendment rights to the US Constitutional.

Plaintiff also alleges that there was perceived Intentional Racial Discrimination in the conduction of Officer A. Garcia, Jr., A. Gonzalez, Does, and Bane Doe supervisor's actions/inactions at the time of the incident.

Libel and Defamation Per Se were alleged in the unfruitful anonymous tips given by Daniel Esquivel to 911 dispatch and subsequently Police Officer A. Garcia, Jr.

## JURISDICTION AND VENUE

This Court has limited subject-matter jurisdiction granted by Congress and personal jurisdiction over the defendants pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's civil cause of action arising under the Constitution of the United States and 42 U.S.C. §§ 1983, 1981 and 28 U.S.C. § 2201 and 2202. This Court has supplemental jurisdiction to adjudicate plaintiff's causes of action arising under Texas state law pursuant to 28 U.S.C. § 1367. There are concurrent and personal jurisdiction permissible under Federal substantive law under the Supremacy Clause at the State and Federal District court level. FCRP 12 (b)(2)

Before a court can exercise [PERSONAL] power over a party, the U.S. Constitution requires that the party has certain minimum contacts with the forum in which the court sits. *International Shoe v Washington, 326 US 310 (1945).* With the exception of Daniel Esquivel, all police defendants have minimum contact with the Federal court forum.  District courts are afforded broad discretion in making decisions regarding SUPPLEMENTAL JURISDICTION and must examine the totality of the circumstances in exercising that discretion, *see Chungchi Che v. MBTA,* 342 F.3d 31, 37 (1st Cir.2003), including "concerns of comity, judicial economy, convenience, fairness, and the like," *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996). The Supreme Court has found that a "suit arises under the law that creates the cause of action," *American Well Works v. Layne,* 241 US 257 (1916), and therefore, only suits based on federal law, not state lawsuits, are most likely to create FEDERAL QUESTION JURISDICTION, *Louisville & Nashville R. Co. v. Mottley,* 211 US 149 (1908).  Claim amount brought in front of the U.S. Court is greater than $75,000, all defendants and plaintiffs are considered U.S. Citizens of Texas, and the court should consider this to be both the primary source of subject-matter jurisdiction: federal question jurisdiction. FCRP 12 (b)(1).

VENUE lies in the US District Court for Western District of Texas -Del Rio Division after removal by defendants and all events or omissions giving rise to Plaintiff's claims occurring in Eagle Pass, Maverick County, Texas pursuant to 28 U.S.C. § 1391 (b)(2); TX Civ P. & Rem. Code 15.002 (a)(1-2); FCRP 12 (b)(3).

Jury Trial is requested where and when required. Bifurcated trials are requested where necessitated.

## PARTIES

Plaintiff John J Palmer is an adult citizen and resident of the City of Eagle Pass, Texas. Mr. Palmer possesses a baccalaureate diploma in Business Management offered by the University of Texas at

Permian Basin. Plaintiff has recently graduated during this civil suit process. Plaintiff currently holds a President's List and Dean's List ranking with recognition by several professors throughout program entirety. Plaintiff is a former U.S. Navy veteran. HE suffers from borderline personality disorder and has asked to proceed in Indigent form.

Third-party civilian, one Daniel Esquivel is liable for instigating the detention by giving false information that did not lead to prosecution, instead resulting in an unlawful arrest by the police officer.

Defendant A. Garcia, Jr. was an officer with the Eagle Pass Police Department when the relevant events occurred. It is unknown if he is still in an official capacity, reassigned, or terminated.

Defendant A. Gonzalez was an officer with the Eagle Pass Police Department when the relevant events occurred. It is unknown if he is still in an official capacity, reassigned, or terminated.

(2) Defendant John Does are unknown officers of the Eagle Pass Police Department who arrived at the scene, after the plaintiff was arrested, that gave rise to this claim for relief. They failed to intervene in the unlawful conduct or report conduct to supervisor. They are sued in their individual and official capacities.

Defendant City of Eagle Pass, Texas is located in Maverick County, Texas. It is a municipal corporation and the employer of Defendants Garcia, Jr., A. Gonzalez, John Does, and supervisor Bane Doe.

## GENERAL PROVISIONS

### INTRODUCTION TO ARREST EVENT

On July 4[th,] 2021, at approximately 7:01 p.m., Plaintiff John Palmer was reported as driving on Bibb Ave and then properly turned into a Murphy's parking lot Bibb Ave and Walmart roads. The lot was located in an incorporated part of Maverick County, inside the jurisdiction of the Eagle Pass Police Department.  Palmer will contest that he arrived at Walmart earlier than the defendant testifies and was seen in **Defense Video Exh. A2** leaving Walmart parking lot and parking in Murphy's gas station parking lot. He was not illegally parked in the parking lot of Murphy's gas station, and he did not engage in any unlawful conduct, to include recklessly driving while in the lot. Plaintiff properly merged left and right and passed public traffic, while signaling with turn signals his intention to turn and did not violate any traffic laws.

Slightly earlier, a police car unit driven by Officer Garcia, Jr. claims in his Incident Report #202100017161 that he received a dispatch notification of an alleged reckless driver at 7 pm on 300 north block of Bibb Avenue headed south (which by Google maps places the marker in the intersection of Bibb Avenue and Main Street) while Officer was on the 2100 block of Main Street. This places the patrol unit about 2-300 feet away, with 2 traffic lights (plaintiff can attest that these lights take 5-10 minutes to turn green) from where he claims the suspect's supposed location was, and further claims that he purveyed a white car driving "faster than others"; this is not feasible nor believable, due to the amount of white cars seen in the video footage, the amount of traffic in both lanes on Bibb Ave, the comparative speed of cars accelerating from a stop versus cars already in motion, and a one-dimensional view of cars from the officer's viewpoint. It would be hard to discern vehicles driving recklessly from this point and is construed as a malicious prosecution. Incident in Exhibit video A2 starts at the intersection of Bibb Ave. and Main St. **[Defense Video Exh. A2 00:00]**. Esquivel reports to officer can be seen driving at **Defense Video Exh. A1 06:26** that he saw the suspect driving erratically around 300-400 S. Bibb Ave (Peter Piper Pizza). This contradicts the Officer's testimony. Please continue reading.

Defendant Officer A. Garcia, Jr., without objective reason, made contact with Plaintiff's vehicle in the parking lot, which according to video, can be seen driving from the opposite direction from which officer claimed suspect was traveling away from him in his report **[Defense Video Exh. A2 01:22]**. The vehicle, upon him making contact with suspect, is affirmed by dispatch officer possessed its partial plate number of "DL6" and a "plastic rear window" **[Defense Video Exh. A2 ~ 01:35]**., which they agreed fully confirmed that the vehicle under investigation was a 2000 Chevrolet Lumina 4-door. Make no

mistake, Officer Garcia, Jr. did not explicitly get word from dispatch, prior to making contact, as to which make and model vehicle he was looking for, or, for that matter, that dispatch was on the phone with the anonymous/verified 911 caller, or whether he could predict the suspects intentions or possessions.

The report lists a Calls-for-Service header containing the "anonymous" 911 caller's name and information to have been Daniel Esquivel, but the report does not contain an audio file with dispatch or a recital of whether the 911 caller was anonymous throughout the incident, immediately following the arrest and Esquivel's time of arrival at scene.

Plaintiff would like to add that he did not have a video camera at the time of incident in car or on his person however, there was video (audio) footage from patrol unit and Officer Garcia, Jr.'s person. Also, would like to allege that he did not possess a weapon, discard a weapon, discard drugs, nor did he have any affiliation with the defendants described in this incident report, nor did he pose a risk to the safety of police or others.

At the Murphy's/Walmart parking lot, Defendant Garcia, Jr. got out of his patrol unit and approached Plaintiff, after Palmer left said vehicle unlocked, and began shouting "Hey!" multiple times before Plaintiff turned around. Palmer then turned around to face Officer Garcia, Jr **[Defense Video Exh. A1 00:38]**. Defendant Garcia, Jr. was not cognizant that he did not make his identity or organization known before allowing Palmer to leave his vehicle or at least before making commands.  The officer made commands that the plaintiff feels the officer did not have just cause to order, not to mention that the plaintiff was disoriented and confused by a random person yelling "Sir" and "Hey" to him **[Defense Video Exh. A1 00:31-00:38]**, instead of identifying himself as a member of a police department and a reason for the stop. Palmer is seen responding in confusion saying "Huh", "What", "What are you talking about" and "Was I illegal" and was reticent in communication and did not hear what the officer was saying, nor did he fully grasp at this point that Garcia, Jr. was even an officer at all. Plaintiff's borderline personality disorder could have attributed to the confusion and distrust of this person.

Shortly after contact being made with the officer, A. Garcia, Jr. quickly comments to the Plaintiff that he was reported as recklessly driving **[Defense Video Exh. A1 00:49]**, requests a driver's license, and immediately imparts an excessive level of force in conducting the arrest. Officer claims he is a lawyer **[Defense Video Exh. A1 01:03]**. At **01:08 [Defense Video Exh. A1]** (possibly there were two?) anonymous 911 caller Daniel Esquivel arrives at scene and assaults and batters Palmer when it was probable that he believed he was rendering aid to the police officer, whilst slamming plaintiff against the vehicle's hood. Esquivel claims to have seen suspect at Peter Piper [Pizza] (around 402 S. Bibb Ave) **[Defense Video Exh. A1 06:26]**.  Officer Garcia, Jr. replies in agreement that, "Yeah I saw him driving a right-hander at regular speed" **[Defense Video Exh. A1 06:24]** which admittedly says nothing. Daniel Esquivel identifies himself barely at this point with Identification **[Defense Video Exh. A1 06:25]**. At **06:43 [Defendant's Video Exh. A1]**, plaintiff can be heard repeatedly informing the officer of handcuff tightness and to please relax the tightness. Officer claims he saw me speeding at this point, which is a complete fabrication.

The timing of the first 911 dispatch call relayed to police officer at 2100 block of Main Street invalidates the theory that someone witnessed Plaintiff driving recklessly or swerving since the incident report claims officer was made aware of a reckless driver around 300 block of Bibb Ave. The intersection of Main and Bibb Ave is 300 N Bibb Ave (without knowing where the initial, alleged anonymous 911 caller made the phone call, at this point) so a police officer who happens to be patrolling around that area, would not have seen a moving vehicle driving hundreds of feet away at that intersection, when the caller allegedly reported a driver at around 300 block of Bibb Ave. Please be advised this is the only south/north -bound section of Bibb Ave with a North (or south) 300 identifiers. The rest of the southbound Bibb Ave section becomes South Bibb Ave. The anonymous caller Esquivel, at the time, reports in **Defense Video Exh. A1 at 06:26** that he saw the suspect driving erratically at 300-400 S. Bibb Ave (Peter Piper Pizza) behind him and was not visible from 2100 Main St vantage point. The timing that the only "credible"

witness reports a reckless driver does not correspond with police officer's report, not to mention the timing or how the caller responded to the arrest site after police arrived. Thus, all anonymous 911 caller information and identities should be dismissed as incredible in determining if the officer had reasonable suspicion (scope discussed below).

Plaintiff suffered emotional distress resulting from the bystander's actions and accusations along with their conduct from Officer Garcia, Jr. and Daniel Esquivel wrestling Mr. Palmer onto the ground. Officer then placed handcuffs with replete, excessive tightness on the Plaintiff **[Defense Video Exh. A1 02:24]**. The plaintiff suffered significant bruising on his wrists, seen as excessive use of force (scope discussed below).

The conduct by Officer A. Garcia, Jr., along with the commands and pat search of Palmer's person, along with Officer A. Gonzalez and A. Garcia, Jr.'s search of Palmer's vehicle **[Defense Video Exh. A1 05:34]** are all seen as illegal search and seizure violations, to be considered injuries, against Plaintiff's 4th and 14th Constitutional Amendment rights, acting in the Color of Law in their official and public capacities. Finding nothing not having been suppressed in the Interest of Justice (since the arrest), Defendant Garcia, Jr. placed Plaintiff Palmer into the patrol vehicle after unlawfully arresting him **[Defense Video Exh. A1 04:42]** and searching his property without consent or warrant.

Plaintiff throughout the encounter with Defendant Garcia, Jr. was not incapacitated, a threat to the safety of himself or others, or disorderly. Plaintiff Palmer chose to remain standing amidst the confusion so as not to break any laws, nor did he feel he needed to comply to the officer's Terry search and questioning.

Defendant Garcia, Jr.'s body- and unit-cameras captured the following events. **(Defense Video Exhibits A1 & A2)**

Conversations between Officers and dispatch, and dispatch and Daniel Esquivel (anonymous 911 caller) were requested in Discovery and not furnished.

## SCOPE OF LAW

### Response to Defendant's 1st Motion to Dismiss

"Under *Federal Rule of Civil Procedure 8(a)(2)*, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the [objective] reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).*

However, Graham's and Garner's standards are cast "at a high level of generality." *Brosseau, 543 U. S., at 199.* "[I]n an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Ibid.* But this is not an obvious case. Thus, to show a violation of clearly established law, Palmer must identify a case that put all defendant officers on notice that his specific conduct was unlawful. Palmer will use such cases (found throughout claims headers) as *LeCourias v. State, No. 14-10-00181-CR (2011); Solomon V. Auburn Hills Police Department, No. 03–1707 (2004); Loggervale v. Alameda County ; Nelson v. State, No.  03-06-00352-CR (2007).*

A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna, 577 U. S. 7, 11 (2015) (per curiam) (internal quotation marks omitted).* Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White, 580 U. S., at ___ (slip op., at 6) (alterations and internal quotation marks omitted).* This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen, 543 U. S. 194, 198 (2004) (per curiam) (internal quotation marks omitted).*

**Standing**

In *Lujan v. Defenders of Wildlife (90-1424), 504 U.S. 555 (1992)*, the Supreme Court created a three-part test to determine whether a party has standing to sue:

1. The plaintiff must have suffered an "injury in fact," meaning that the injury is of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent:
2. There must be a causal connection between the injury and the conduct brought before the court:
3. It must be likely, rather than speculative, that a favorable decision by the court will redress the injury:

1) Plaintiff is claiming defendants violated actual concrete and particularized Constitutional rights and created injury 2) Plaintiff is establishing an argument creating causation that officer(s) and anonymous caller(s) created an constitutional injury through their alleged conduct. 3) It is imminent that a favorable decision by the court will redress the injury, substantially.

**Color of Law**

To succeed on a Section 1983 claim, a plaintiff must prove that his constitutional rights were violated, and that the violation was caused by a person acting under color of law. *West v. Atkins, 487 U.S. 4242 (1988)*. All constitutional violation claims are set out as we progress in this petition. It has been determined that all officers and supervisors depicted were operating on duty and their conduct in the Color of Law. Only intentional conduct is actionable under Section 1983. Negligence is insufficient to incur Section 1983 liability. *Daniels v. Williams, 474 U.S. 327 (1986)*. All action is therefore deemed to have been intentional in the context of their concurrent action throughout the timeline of the arrest event.

Palmer contends that the defendants acting with intent to arrest a particular or random member of the public without ever having seen him or having accurately corroborated the facts surrounding calls to emergency service or indicia on the suspect prior to making contact with a citizen and arrest.

**Individual Liability**

However, an officer may still be liable even if he or she did not commit the act that injured the plaintiff. An officer who is present and fails to intervene to prevent other law enforcement officers from violating a person's constitutional rights is liable under Section 1983. *Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972)* (an officer who knows about unlawful conduct and has a realistic opportunity to intervene and prevent harm from occurring is liable).

The above trial law application can reasonably be decided to have been extracted from the Texas Commission on Law Enforcement's Model Policies; Duty to Intervene and Duty to Report Excessive Force.

**Supervisory Liability**

Supervisor must know of the subordinate's misconduct and facilitate, approve, condone, or turn a blind eye toward it. *Gentry v. Duckworth, 65 F.3d 555 (7th Cir. 1995)*. Here, the Bane Doe supervisor is seen as facilitating misconduct and turning a blind eye from said misconduct due to the lack of enforcing policies such as Duty to Intervene, excess force & racial profile reporting and failure to initiate discipline. Later, supervisor and individual officer personnel files will be admitted in evidentiary proceedings.

## Qualified Immunity

### Scope

A Court of Appeals concluded that qualified immunity is merely duplicative in an excessive force case, eliminating the need for the second step where a constitutional violation could be found based on the allegations. In *Anderson*, a warrantless search case, we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry. We acknowledged there was some "surface appeal" to the argument that, because the Fourth Amendment's guarantee was a right to be free from "unreasonable" searches and seizures, it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he " 'reasonably' acted unreasonably." *483 U.S., at 643, 107 S.Ct. 3034.* The plaintiff concurs with this burdensome rationale and thus agrees that the defendants are entitled to the qualified immunity test.

Through the use of qualified immunity, the law shields "government officials performing discretionary functions... from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).* The United States Supreme Court has constructed a two-part test to determine whether an officer-defendant should be granted qualified immunity. *See Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).* First, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, "show the officer's CONDUCT VIOLATED A CONSTITUTIONAL RIGHT." *Id. at 201, 121 S.Ct. 2151.* If the answer is yes, the court must then decide "whether the right was CLEARLY ESTABLISHED." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Id. at 202, 121 S.Ct. 2151.* Next, the ruling court must determine if the trial law used by the plaintiff has controlling PRECEDENCE in the jurisdiction presiding. The existing precedent must (1) be "particularized" to the specific facts of the case and (2) have placed that constitutional question "beyond debate." *White v. Pauly, 137 S. Ct. 548, 552 (2017).*

Furthermore, the [FAIR] NOTICE RATIONALE shows why the current doctrine of qualified immunity is overbroad. When an officer acted without good faith, her conduct violated an existing criminal law, or her conduct was malum in se, the notice rationale does not support immunity. *Chapman, N. (2023). Fair Notice, The Rule of Law, and Reforming Qualified Immunity [Review of Qualified Immunity]:*

### Putting Fair Notice into Context

1. The exact definition of official GOOD FAITH may have been inconsistent across jurisdictions, but one court said "[m]alice for constitutional purposes includes 'callous' or 'wanton neglect,' and 'reckless indifference to the rights of the individual citizen.'" *Downs v. Sawtell, 574 F.2d 1, 12–13 (1st Cir. 1978) (first quoting Harper v. Cserr, 544 F.2d 1121, 1124, 1125 (1st Cir. 1976); and then quoting Kelley v. Dunne, 344 F.2d 129, 133 (1st Cir. 1965)).* The plaintiff has claims alleging the officer maliciously prosecuted him, without probable cause in verifying the suspect's true identity versus the anonymous 911 caller's indicia prior to initiating detention, and together with the unconstitutional use of force committed, were in BAD FAITH and against the 4th amendment for actions against the plaintiff.

2. Courts rightly distinguish between the legal rules an official's CRIMINAL CONDUCT may have violated. The same conduct may amount to...an unreasonable seizure in violation of the Fourth Amendment—or to a subset of those norms. *See, e.g., Jessop v. City of Fresno, 936 F.3d 937, 941–42 (9th Cir. 2019).* In this case, judgment should be rendered for particularized claims such as malicious prosecution, unlawful arrest, search & seizure, and excessive use of force.

3. For similar reasons, qualified immunity should not apply when the official's conduct is MALUM IN SE. *See John C. Jeffries, Jr., What's Wrong with Qualified Immunity? 62 FLA. L. REV. 851, 869 (2010)* ("In my view, truly appalling unconstitutional conduct should not be protected by qualified immunity."); *Nielson & Walker, supra note 15, at 1874.* The concept of malum in se rests on a deontological ethic, the notion that some conduct is categorically wrong because it fails to treat people with equal dignity. *See William Hawkins, A Treatise Of The Pleas Of The Crown 389 (5th ed. 1771).* Just as with criminal violations, an official is already on notice that conduct that is MALUM IN SE will be subject to the public's moral censure. *Nielson & Walker, supra note 15, at 1873.* Trial law cases borrowed as precedence to the plaintiff's will at times show that the officer treated the people depicted with equality. However, in Palmer's particular case, evidence will show that he was not treated with dignity; analogous with some commonalities. For this reason, he is filing a §1981 claim for discrimination damages. Rather, a plaintiff must raise a claim under §1983 to remedy a State actor's 1981 violation. *Oden v. Oktibbeha Cnty., 246 F.3d 458, 463 (5th Cir. 2001).*

Whatever the over-deterrence rationale may support, the notice rationale does not support immunity when an officer acted with the "malicious intention" to violate a constitutional right or cause other injury. *See Wood v. Strickland, 420 U.S. 308, 322 (1975), abrogated by Harlow v. Fitzgerald, 457 U.S. 800 (1982); see also id. at 321* ("The official himself must be acting sincerely and with a belief that he is doing right . . ."). Any reasonable officer would have known that they could not be acting sincerely, or with a belief that what he is doing is right, when he does not identify himself or inform the actor under duress that he is under arrest.

Finally, appease the court and defense, please consider all information recited above as well as information therein concerning the defendant's qualified immunity. Here, plaintiff asserts four (4) theories.  First, plaintiff argues that the officer lacked reasonable suspicion and probable cause for an investigatory terry-stop and so the eventual arrest and detention, even the audio recordings made, were unlawful.  Second, plaintiff argued that the vehicle search violated the 4th Amendment. Third, plaintiff argues the officer used excessive force.  Fourth, the defendant initiated an intentional malicious prosecution against the plaintiff. Optional, the plaintiff believes that a perceived intentional discrimination towards him motivated all claims.

**Statute of Limitations**

Section §1983 does not provide a statute of limitations. Federal courts are directed to follow the most analogous state statute of limitations pertaining to injuries to the rights of a person. *Wilson v. Garcia, 471 U.S. 261 (1985).* In Texas, the statute of limitations is two years for personal injury claims. Thus, the statute of limitations for Section §1983 claims is two years. Section §1983 claims accrue when "the plaintiff knows or has reason to know of the injury which is the basis of the action." *Gantrell v. Gaylor, 981 F.2d 254, 257 (5th Cir. 1993).* Claim accrues when plaintiff knew or should of? known of her injury. *Serino v. Hensley, 735 F.3d 588 (7th Cir. 2013).* The Plaintiffs' section §1983 claims are subject to a two-year statute of limitations under *Texas Civil Practice and Remedies Code section 16.003*, for arrest

incident taking place on **07-04-2021**. I ask that the Court decide. Plaintiff's case was docketed in State district court on **06-2023**.

**Equitable Tolling**

The plaintiff seeks the benefit of equitable tolling to preserve [his] claims. *See Br. Supp. Resp. Mot. Dismiss 9 (citing Stoll v. Runyon, 165 F.3d 1238 [9th Cir. 1999]).* "The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." *United States v. Patterson, 211 F.3d 927, 930 (5th Cir. 2000).* Application of equitable tolling is a question of fact that turns on the circumstances of a particular case. *See Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999)* ("As a discretionary doctrine that turns on the facts and circumstances of a particular case, equitable tolling does not lend itself to bright-line rules, but we draw on general principles to guide when equitable tolling is appropriate.") Thus, plaintiff respectfully asks the Court that equitable tolling be applied and allowed where necessary to meet the plaintiff's claims as he has already met the burden of stating a valid claim and submitting petition within state law. Reasonable accommodations were made to timely obtain counsel, with no avail, and under indigency.

**Reasonable Suspicion**

**Events Leading to Arrest Site**

The United States Court of Appeals for the Third Circuit held that a caller's anonymous tip bore sufficient indicia of reliability for the 4th Amendment's reasonable suspicion. *United States of America v. Ibrahim McCants, No. 17-3103.* While a tip from a 911 call may generate reasonable suspicion, it can only do so when, under the "totality of the circumstances," it possesses two features. *United States v. Rowland (9th Cir., 2006) 464 F.3d 899, 907).* First, the tip must exhibit sufficient indicia of reliability, and second, it must provide information on potential illegal activity serious enough to justify a stop. *United States v. Edwards (9th Cir., 2014) 761 F.3d 977, 983.* In the instance of *Palmer v. City of Eagle Pass,* there is insufficient evidence of a tip alleging criminal activity serious enough to justify a stop, such as reckless driving, when the suspect could merely be transitioning changing lanes pursuant to Transportation Code. Even if there were evidence of audio recordings directly verifying the veracity of Esquivel's allegations, Officer Garcia, Jr. only mentions that he received a call of a vehicle allegedly "recklessly driving", and while he states that he saw 'the' vehicle in question, this is unbelievable given the timing of the events from call to engaging of a suspect. There is insufficient evidence to support through audio or video recordings or through incident report that the officer was aware of the plaintiff's name, personal description, vehicle description, insider knowledge of intent, hostility, contraband, paraphernalia, etc. Plaintiff did not admit a key piece of information in affidavit format in his earlier Amended Petition, because Defendant would not have, at that time, considered this possibility anyhow to the Court. The plaintiff would like to add that he did not want to unintentionally incriminate himself with rationalization at this state. Officer Garcia, Jr. does not consider that the suspect Palmer was seen leaving the Walmart establishment or arriving at the Walmart parking lot from a completely different location or direction **[Defense Video Exh. A2 01:22]** than first elicited in report. The video exhibits do not show the anonymous 911 caller following the plaintiff to his destination. If he had, he too would have irrevocably seen that the suspect was not driving through southbound through Bibb Ave minutes earlier.

In *Navarette v. California 134 S. Ct. 1683 (2014)* the Court sought guidance from *Alabama v. White, 496 U.S. 325, 327 (1990)* (explaining that the tip included, in part, the building name and apartment number from which the alleged perpetrator would emerge, a detailed description of her car, and the destination to which she would likely travel) and *Florida v. J.L., 529 U.S. 266, 271 (2000),* but the result in Navarette is out of step with the analysis in these cases. In White, an anonymous tipster provided a laundry list of details that law enforcement officers could (and did) corroborate. The anonymous tipster in J.L., by contrast, provided only a "bare report" of the alleged perpetrator and criminal activity. What elevated the reliable tip in White above the unreliable one in J.L. was the specificity and character of the

information given to law enforcement. The comprehensive predictions in White submitted something for the police to corroborate; once corroborated, the information enhanced the reliability of the tip by suggesting the tipster's knowledge arose from intimacy with the accused. The facts of Navarette largely track those of J.L. In Navarette the tipster predicted details that any outside observer could have noticed. If public details were enough, then the J.L. tip should have aroused reasonable suspicion. But the J.L. Court helpfully explained why a "description of the suspect's visible attributes," however "accurate," does not establish reasonable suspicion for a stop: to generate suspicion, a "tip [must] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." The Navarette tip suffered from the same flaw: it merely identified a specific vehicle. This similarity helps explain why J.L. prompted several lower courts to invalidate laws that had lessened the reliability standard an anonymous tip had to meet before arousing reasonable suspicion of drunk driving; not reckless driving. For the Court's information, reckless driving (along with similar offenses) can in fact be reduced to a lesser misdemeanor of Disturbing the Peace. Prosecutors can validate this.

Also, Because Officer [] detained appellant without a warrant, the State had the burden of proof to establish that the detention was reasonable. *See Ford, 158 S.W.3d at 492* (Officer Coppedge corroborated Garcia's identification details when he located appellant's car in the Emilio's parking lot). For analogous comparison, *Hawes* was a DWI case in which the arresting officer received dispatch information consisting of a [full] license plate number, description of the vehicle, its location, and its direction of travel. *Hawes, 125 S.W.3d at 537*. Not in comparison to this case, the arresting officer was told that the informant was still following the vehicle. In, having chosen to follow appellant's vehicle after reporting the conduct, Garcia was not a "truly anonymous informer." *See Hawes, 125 S.W.3d at 540*. In this case Palmer vs Garcia, Jr., the tip, given by the anonymous caller Daniel Esquivel, was communicated to police as one for reckless driving and (not a more serious offense of drunk driving) and the details found on the police report corroborating that of the 911 caller's do not appear to give much level of indicia in determining the suspect allegedly seen was the actual person recklessly driving, the full vehicle description and plate number, or the suspect's proposed destination; although both the officer and Esquivel arrived at the destination Palmer happened to be in.

Furthermore, anonymous tips can provide information helpful to investigations and can create reasonable suspicion of ongoing criminal activity. The Third Circuit Appellate court has identified (five) factors that indicate reliability for anonymous tips:

(1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
(2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
(3) The content of the tip is not information that would be available to any observer.
(4) The person providing the information has recently witnessed the alleged criminal activity.
(5) The tip predicts what will follow, as this provides police with the means to test the informant's knowledge or credibility.

Response:   1) It is unknown, other than in report, what was communicated between the 911 caller (Esquivel) and dispatch or if anything was relayed to Officer Abel Garcia, Jr. prior to initiating pursuit, that would allow opportunity to appraise the witness' credibility. 2) Daniel Esquivel is shown in **Defense Video Exh. A1** lying that he witnessed suspect, through hand signals, swerving at or around a Peter Piper Pizza establishment, as to the timing of calls to 911 and well ahead of where dispatch initially noted the driver was observed at. The timing of the anonymous call from Esquivel does not correspond to the timing that would have been cited in Incident Report or Exh. Video A1. This is against bright-line rules of evidence, that allegations were fabricated. *See Fed RoE Rule 806*. 3) Defendant Esquivel is presumed to have not had or given any information that would be considered privileged or exclusive from the public eye, such as a weapon or firearm, or the location suspect was headed to, putting into question the level of severity of the offense. 4)  Defendant Esquivel claims to have seen plaintiff John Palmer driving

recklessly or erratically on public roads and does not stay in contact with 911 dispatcher, nor would he have known where plaintiff's destination was, nor does he follow suspect to his destination, but somehow arrives there after-the-fact.  5) There is no insider knowledge of intent to cause harm to another bystander or police officer.

In *Nelson,* Officer Ybarra's belief that the information he had received from the dispatcher did not give him a reasonable basis for stopping Nelson, *State v. Nelson, No. 03-06-00352-CR. June 29, 2007,* however, Nelson's motion to suppress was affirmed. Deputy Ybarra, given the severity of the crime alleged, stated there was nothing unsafe in the movements of Defendant's vehicle, after he stated the opposite before he arrested Nelson, as he followed behind the Defendant. This case establishes precedence with the plaintiff's in that all evidence attained during the unlawful search and seizure by Officer's Garcia, Jr. and A. Gonzalez were suppressed and, subsequently, puts officers on fair notice and that charges were then later dismissed. In *Brother*, the defendant's erratic driving was reported by a citizen who called 911 on her cell phone after she witnessed the defendant speeding, tailgating, and weaving across several lanes of traffic. *166 S.W.3d at 256*. The citizen continued to follow the defendant and monitor his driving, remaining in contact with the 911 operator until the defendant was stopped by a police officer. *Id.* at 257. The citizen remained at the scene of the stop and provided the officer with her contact information. *Id.* Although the officer did not personally witness a traffic offense, the court of criminal appeals affirmed the court of appeals' judgment that under the totality of the circumstances, the stop was reasonable under the Fourth Amendment. *Id.* at 259-60. This case is analogous with the plaintiff's but differs in that the indicia supplied by caller was sufficient and credible. The 911 caller actually follows the suspect in this case. In *Reesing*, an identified caller to 911 reported seeing the defendant, who had displayed signs of intoxication in the caller's presence, driving away from a store. *140 S.W.3d at 734* (Tex.App.-Austin 2004, pet. ref'd). The caller provided a description of the defendant and his car and followed him in his own vehicle, reporting the defendant's location and describing his erratic driving. *Id.* An informant's willingness to be held accountable for his intervention further enhances his reliability. See *id*, 140 S.W.3d 732, 736. The defendant was stopped by a police officer acting on the basis of the information supplied by the caller and who did not personally see the defendant commit an offense. *Id.* at 735. This Court held that under the totality of the circumstances, the officer had a reasonable basis for suspecting that the defendant was driving while intoxicated and to stop him for further investigation. *Id.* at 737. Similar to Brother, this case is analogous with that of the petitioner's, but the caller is noted as having followed the suspect. In *Loggervale v. Alameda County, (Cause # 3:20-cv-04679-WHA),* officers were investigating auto thefts at the specific parking lot suspects were found parked in. The officer ran plate information and determined the suspect's vehicle was a rental vehicle. This was all they had to believe this was reasonable suspicion necessary to question the Loggervale's; this led to an unlawful detention scenario. Loggervale civil rights attorney claims their race was a proponent in the nature of the stop on the Loggervales.

Officer Garcia, Jr. is seen to have believed undeveloped and unparticularized facts by an anonymous 911 caller insufficient to grant reasonable suspicion to perform a basic Terry stop. Officer does not witness the suspect at any point in the timeline of pursuit or prior to the arrest to adequately give notice to all parties that the suspect the police officer pulled over was in fact the vehicle in question. It is not enough to accept the anonymous caller's identity or credibility after he arrived at the scene at a further time than the police officer did. This led to the infringement of an innocent bystander's 4th and 14th Amendment rights. All infractions listed in *State v. Palmer* were dismissed In the Interest of Justice, and all subsequent evidence found at the arrest site was suppressed and dismissed, in full by County Attorneys. This should lend weight to plaintiff Palmer's claims against the defendants' rebuttal.

**Gatherings Up Until Now**

In *Ramirez*, one passage recounts how courts must "frame the constitutional question with specificity and granularity," rather than "at a high level of generality." *Ramirez, 44 F.4[th] at 292 (quoting*

*Morrow v. Meachum, 917 F.3d 870, 874-75 (5th Cir. 2019) and Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).* Given the facts above listed in chronological format, the plaintiff has already found holes and deficiencies in the defendant's affidavits and hearsay accounts, as to constitute a lack of granularity in bad faith to establish reasonable suspicion that the suspect (now plaintiff) has violated any laws up to this point in time, respectfully. (See **Reasonable Suspicion – Events Leading to Arrest Site**, and **INTRODUCTION TO ARREST EVENT** above).

      Plaintiff is operating under the assumption that the court would agree as well that Officer Garcia, Jr. is performing a Terry-stop of a suspect with a lack of objective reason in doing so, and that all normative police officers would raise a brow as to the specificity of the indicia passed down through the dispatch officer and that pursuing any particular white vehicle would be a losing case. Using only the police **Incident Report 202100017161** as affidavit of indicia, to include all partial descriptions such as partial plate number and color of vehicle as only identifiers, are detected as being realized after Garcia, Jr. makes contact with plaintiff's particular vehicle. It is uncertain if 911 Caller Daniel Esquivel was even the first 911 caller at all due to his video hearsay testimony that he saw suspect at a different address than where Officer Garcia, Jr claims seeing suspect. Plaintiff asks the court that Esquivel be considered an anonymous caller, until he reaches the arrest site. Even in relinquishing his credibility up to this point, all prosecution has since been dismissed in the Interest of Justice, and all evidence obtained during the search and seizure, suppressed.  Esquivel should cease to be considered a credible or reliable anonymous 911 caller and all communications deemed unverifiable hearsay.

      All contention is further strengthened by Maverick county's Asst. County Attorney Cecilia Mascorro's order to decline prosecution with prejudice in the Interest of Justice. According to Deputy for Legal Education Thomas P. Franczyk, there are many different substantive and procedural grounds to seek dismissal of an accusatory instrument including: legal insufficiency of evidence underlying an indictment (CPL 210.20[1][b]), defective grand jury proceedings (CPL 210.35), facial insufficiency of an information (CPL 100.15, 110.40, People v Alejandro 70 NY2d 133 [1987]), hearsay pleading defects in information (People v Casey 95 NY2d 354 [2000], statute of limitations (CPL 30.10), speedy trial violations (CPL 30.30, 30.30), and double jeopardy (CPL 40.20) to name a few. There were facial and hearsay insufficiencies and defects, respectfully, in information found on defendant's incident reports that should be noted.  In determining whether a circumstance compelling dismissal in furtherance of justice exists, the court must consider: a. the seriousness and circumstances of the offense; b. the extent of harm caused by the offense; c. the evidence of guilt (whether admissible or not); d. the history, character and condition of the then defendant ; e. any exceptionally serious misconduct of law enforcement in the investigation, arrest or prosecution of the defendant; f. the purpose and effect of imposing on the defendant a legally authorized sentence; g. the impact of dismissal on the safety and welfare of the community; h. the impact of dismissal on public confidence in the criminal justice system; i. any other relevant factor indicating that a judgment of conviction would serve no useful purpose.

      Plaintiff will proceed under the resolution that officers do not possess OBJECTIVE REASONABLE SUSPICION. They are operating under their personal, subjective beliefs, under the Color of Law, that the suspect they stopped, if there was even an original suspect at all, with limited indicia proved, is in violation of a state statute, instead choosing to defer from utilizing training and trial law opinion and facts to establish PROBABLE CAUSE of a purported violation of the law. The Court should stipulate.

**Events Following Arrival at Arrest Site**

      Once Officer Garcia, Jr. dismounts his cruiser, what was depicted in **Defense Video Exh. A1** are commands and orders, instead of making the suspect aware of his presence, identity, and the nature and reason for his stop. The plaintiff, upon leaving his vehicle, is unaware of the police's presence, or even that he had committed a crime. He is walking to the establishment as a patron, and not as a suspect fleeing or resisting arrest. Our cases make it clear that a seizure does not occur simply because a police

officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D., 499 U. S. 621, 501 U. S. 628 (1991)*, the encounter is required to be consensual, yet no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio, 392 U. S. 1, 392 U. S. 19, n. 16 (1968)*.

**Failure to Identify**

Concerning a police officer identifying himself during terry-stop, a unanimous Seventh Circuit panel in *Doornbos v. City of Chicago (2017)* stated that, "although some unusual circumstances may justify an officer's failure to identify himself in rare circumstances, it is generally not reasonable for a [plainclothes](interchangeable?) officer to fail to identify himself when conducting a stop." Officer McFadden approached the [] man, identified himself as a police officer and asked for [his] name. At this point, his knowledge was confined to what he had observed. He was not acquainted with [] the man by name or by sight, and he had received no information concerning [him] from any other source. *Terry v. Ohio, 392 U.S. 1 (1968)*. This case is analogous to that of the plaintiff's in that Garcia, Jr. was uncertain if Palmer was, in fact, the suspect alleged because he did not know his name, even if he did receive information concerning a reckless driver, there was not enough indicia to ascertain it was truly Palmer. Plaintiff was not deemed by caller to be dangerous or having privileged knowledge of him carrying a firearm, or better, for that matter.

Recent events are somewhat different from the aforementioned cases in which law enforcement officers appeared indistinguishable from civilians. But litigation arising from law enforcement officers' failure to identify themselves, during the recent protests would likely entail a similar inquiry into the objective reasonableness of an officer's activity. We must view the facts in the light most favorable to Plaintiff and will assume that the officers did not announce themselves. *Beckman v. Hamilton (2018), No. 17-12407*. Further, even if the officers failed to declare themselves verbally, in the light of all the surrounding circumstances—including the officers' dress and that, upon the officers' arrival, Campbell acted by turning and retreating to the suspicious place—an objectively reasonable officer in Deputy Hamilton's position could have believed that suspect was, in fact, aware of the officers' presence. In Palmer's case, given the video evidence presented, it is without question that a reasonable officer, viewing plaintiff Palmer walking away from officer's presence without identifying himself, would know that the suspect was unaware of his presence. Especially, when the officer did not use his loudspeaker to instruct an unknown suspect or initiate "cherries and berries" (police lights) to raise the plaintiff's awareness.

According to Texas Penal Code § 38.02 states a person commits an offense if the person lawfully under arrest or detention fails to give an identification or other indicia. The officer also is heard requesting identification from the plaintiff but does not issue due to confusion and because the plaintiff has not broken the law to this point. The plaintiff has not even been made aware that he is under arrest or detention at this point. Since the police officer is ordering the plaintiff to return to his vehicle before apprehension or questioning, this should be deemed a seizure, as the plaintiff no longer feels free to leave and disregard the police. Officer Garcia, Jr. has not been given reason whether the suspect is trying to break the law or that he is a threat to himself, others, or the police. Concerning the plaintiff's failure to provide identification, he contends that the failure to provide the requested information to a peace officer is not a crime of moral turpitude. *See Lester v. State, 366 S.W.3d 214, 215 (Tex. App. 2011)*. Plaintiff also agrees with the Austin Court that the offense of failure to identify by refusing to give the requested information to a peace officer is not a crime of moral turpitude. *See Jones v. State, No. 03–04–00428–CR, 2005 WL 2673677, *3–4, 2005 Tex.App. LEXIS 8720, 10–13 (Tex.App.-Austin Oct. 20, 2005, pet. ref'd)* (not designated for publication*). [He] remained in the public area of the airport. McGee asked respondent if he had some identification. Respondent said that he did not. *Florida v. Rodriguez, 469 U.S. 1 (1984)*.

## FEDERAL CLAIMS
### 5th Amendment Violation

**5th Amendment**

Palmer is practicing his 5th Amendment right to be free from self-incrimination, among other reasons, He refused to answer questions asked by officers initiating a seizure of plaintiff's person. The Officers at the scene failed to read suspect Palmer his Miranda Rights, at any point during his incarceration, and can be proven by video evidence Exh. A1. More importantly, success on the merits of his Fifth Amendment claim would entitle him to an award of nominal damages. *See Schneider v. Cnty. of San Diego,* 285 F.3d 784, 794 (9th Cir.2002) ("[N]ominal damages must be awarded if a plaintiff proves a violation of his [or her] constitutional rights." (quoting *Estate of Macias v. Ihde,* 219 F.3d 1018, 1028 (9th Cir.2000))).

### 4th Amendment Violations

**Search and Seizure**

The 4th Amendment prohibits unreasonable searches and seizures.  Reasonableness is the ultimate measure of the constitutionality of a search or seizure. S&S with a warrant must also satisfy the reasonableness requirement. Searches require warrants supported by probable cause however, an officer may conduct a brief investigatory stop under *Terry v. Ohio, 392 U.S. 1 (1968)* if they have reasonable articulable suspicion that criminal activity is afoot. Reasonable articulable suspicion requires at least a minimum level of objective justification for making the stop and more than an undeveloped and unparticularized suspicion or hunch of criminal activity. Officer may make a brief investigative stop only where (s)he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity," commonly referred to as reasonable suspicion.  *Navarette v. California (2014) 572 U.S. 393, 396-397.*  No reasonable police officer would believe they had reason with the level of indicia the 911 caller gave him or her to search and seize a suspect or their vehicle at this point, when the identity or make & model of the suspect or vehicle is unknown.

However, *Lipton v. United States, 348 F.2d 591, 594 (9th Cir. 1965)*, justifies suspicion-less detentions and demands for identification only when officers are engaged in enforcing sections of the Vehicle Code that "could not otherwise be effectively enforced." *United States v. Carrizoza-Gaxiola, 523 F.2d 239, 241 (9th Cir. 1975). Lipton* makes officers' true purpose essential. *Carrizoza-Gaxiola,* a follow-on case, later assumed the position and invalidity of *Lipton* after *Terry.* It held that the Vehicle Code could not justify a suspicion-less detention of a defendant, because when they stopped the Plaintiff, officers had been investigating auto theft.

To deconstruct this argument, plaintiff cites *TX Transp. Code, Tit. 7, Subt. C, Ch. 543 & 545, Sch. A. & Sch. I., Sec. 543.001 and 545.401 (2)*, respectfully, which states Any peace officer may arrest without warrant a person found committing a violation of these subtitles. *Sec. 543.004* states a notice to appear is required on certain offenses in which an officer shall issue a written notice to appear if the offense charged is Speeding and implies that an arrest is Not warranted.  *Sec. 545.401* states an offense under this section is a misdemeanor punishable by: (2) confinement (arrest) in county jail for not more than 30 days. *Transportation code 543, Sch. A, Sec. 543.004* states that a notice to appear can be given to a suspect cited with A. Speeding and C. Open Containers, however, *Sec. 543.010.*  states that specifications of a speeding charge are required to show that the complaint and the summons or notice to appear on a charge of speeding under this subtitle must specify (1) the maximum or minimum speed limit applicable in the district or at the location; and (2) the speed at which the defendant is alleged to have driven.  Be advised, Officer Garcia Jr. does not cite in his report any violation or citation for speeding or reckless driving, instead recounts that plaintiff Palmer was driving faster than others at an intersection of Bibb Ave and Main St. He is found stating in his video camera footage that he witnessed the plaintiff driving recklessly, which **Defense Video Exh. A2** magnanimously disproves. This video does not show a

proper time, or a clock counter, depicting that the officer could have seen a suspect aligning with witness' time they called 911 service. Officer could have made an agreement with the suspect Palmer, after questioning, on a written notice to appear before magistrate for the offenses alleged, as Palmer was not a threat at the point before officer and anonymous caller laid hands on suspect. Officer Garcia, Jr. at no point even suggests this to plaintiff or to his supervisor/peer. *Transportation code 543, Sch. A Sec. 543.008* states a violation by an officer of a provision of *Sections 543.003-543.007* is misconduct in office and the officer is subject to removal from the officer's position.

      Once handcuffs were placed on the Plaintiff J. Palmer and a Pat-down conducted, which he did not have cause to perform, Officer Garcia Jr. then, without asking permission to conduct a warrantless search on suspect's vehicle, conducted the illegal search under his own volition and without reason. Longstanding precedent establishes that officers cannot search pursuant to [subjective] reasonable suspicion. See *Sibron v. New York, 392 U.S. 40, 63 (1968)*. This is direct violation of Plaintiff's 4th amendment Constitutional rights to be free from UNREASONABLE SEARCHES AND SEIZURES (violation of 42 U.S.C § 1983). No gun was found in the Plaintiff's vehicle or person, Plaintiff did not freely walk back to his vehicle throughout the arrest, nor was there any FBI background information pertaining to conduct that would warrant the arrest.

**Fair Notice**

Officers did not consider issuance of habeus corpus in lieu of arrest or even considered releasing Plaintiff from detention with promise to report to magistrate judge on specified date and time. In *Loggervale v. Alameda County, (Cause # 3:20-cv-04679-WHA)*, officers were investigating auto thefts at the specific parking lot suspects were found parked in. The officer ran plate information and determined the suspect's vehicle was a rental vehicle. This was all they had to believe, this was reasonable suspicion necessary to question the Loggervale's; this led to an unlawful search, seizure & detention scenario. Loggervale civil rights attorney claims their race was a proponent in the nature of the stop on the Loggervales. This case gives Officer defendants in Palmer's civil suit fair notice of the constitutional rights violation of UNREASONABLE SEARCH & SEIZURE of Palmer's vehicle and person.

**Unlawful Arrest**

      A warrantless arrest under the 4th Amendment may be justified where probable cause and urgent need are present prior to the arrest. The plaintiff, along with declination of prosecution IOJ, and 4th Amendment suppression of evidence found at the arrest site, suggests that the police officer Garica, Jr. did not meet the minimal prerequisite of having established reasonable suspicion, at or before the arrest, or probable cause, during or before the arrest, to justify a warrantless arrest of the plaintiff. There were no 'exigent' circumstances found to justify a warrantless arrest.

      Officer Garcia, Jr. did not detect alcohol odor prior to detention/arrest. Officer Garcia, Jr. did not administer field-sobriety tests at any point; this is a direct violation of plaintiff's 4th amendment right to be free from UNLAWFUL ARRESTS. Arrest was performed for merely changing lanes with signal lights in accordance with *TX Transportation code 545.060*, he initiates arrest without informing plaintiff Palmer of his intent to arrest nor does he command suspect to "Stop, turn around, with hands behind your back, you are under arrest", signaling he is initiating arrest concurrently violating plaintiff's 4th and 14th Amendment rights to be free from UNLAWFUL ARRESTS AND DETENTIONS (violation of 42 U.S.C § 1983). Officer did not have a legal warrant for arrest at the time of arrest, search, or seizure!

**Fair Notice**

      Officer Ybarra's belief in *Nelson* that the information he had received from the dispatcher did not give him a reasonable basis for stopping Nelson...thus, the court concluded that both the initial traffic stop, and the subsequent arrest were unlawful. *State v. Nelson, No. 03-06-00352-CR (Tex. App. 2007)*. *Nelson* sets precedence to Officer Garcia Jr.'s unlawfully arresting Palmer, and fair notice of their actions. Officer Garcia, Jr. is seen taking plaintiff Palmer under arrest, having not committed any violations of the

law, remaining cognizant that the 911 caller had not followed the suspect to his destination site. The witness followed the Jeep and observed the vehicle… and remained on the telephone with the dispatcher until officers arrived less than one minute later. *LeCourias v. State, No. 14-10-00181-CR (Tex. App. 2011). LeCourias* is distinguishable from *Nelson* in that the officer had absolute objective, reasonable suspicion and the appropriate levels of indicia to conduct the stop and arrest.

**Excessive Force**

The 4th Amendment's reasonableness standard requires "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" before using [excessive/deadly] force. *Garner,* 471 U.S. at 11, 105 S. Ct. 1694.  All searches and seizures under the 4th Amendment must be reasonable and no excessive force shall be used. In *Graham,* the question was whether excessive force should be analyzed as substantive due process claims (14th) or as 4th Amendment claims. *Graham,* 490 U.S. at 388, 109 S. Ct. 1865. Chief Justice Rehnquist referred in a general way to the 4th Amendment as requiring an "objective reasonableness" standard. *Price v Sery.* The *Graham* Court clarified that the reasonableness inquiry turned upon the circumstances confronting the officer, rather than the officer's SUBJECTIVE beliefs or intentions: "As in other 4th Amendment contexts, however, the `reasonableness' inquiry in an excessive force case is an OBJECTIVE one: the question is whether the officer's actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard for their underlying intent or motivation." *Price v Sery.* at 397, 109 S. Ct. 1865. In its lengthy analysis leading to its conclusion, the Court [Chief Justice Rehnquist] noted that the movement away from the common law rule in a number of states suggested that what was "reasonable" was not frozen in time with the common law. *Price v Sery. at 13-20, 105 S. Ct. 1694*. In particular, the Court found it significant that police departments were "overwhelmingly" moving away from the common law rule. (*Price v Sery. at 18, 105 S. Ct. 1694*). This can be in and of itself the main marked reason why police officers believe they have a right to use force above what is required when little to no objective reason or cause exists and thus can be perceived as police ambivalently possessing an external locus of control and as the main, marked reason why they violate racial-group privacy and use excessive force, as bound by common law. The *Garner* and *Graham* decisions are the Court's leading cases bringing claims about the use of force—allegedly excessive or deadly—by law enforcement officers under the rubric of modern 4th Amendment search-and-seizure analysis, rather than under the substantive due process of the 14th amendment. Both cases focused on the "totality of the circumstances" and the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, 490 U.S. at 396, 109 S. Ct. 1865*; *see also Garner, 471 U.S. at 9, 105 S. Ct. 1694*. Mr. Palmer, can be seen in video evidence, has already vindicated and also will testify that he has always been cognizant of 4th amendment and common law surrounding the issue that he was not a threat to others or the police at any time throughout the timeline of the arrest. All reasonable, renown police officers would have known that they did not have any reason to conduct a routine "terry" stop on the plaintiff given complete lack of "probable cause" or insufficient indicia to reconcile a reasonable suspicion; particularly facts found prior to the stop and not having seen plaintiff violating any laws, or the unreliability of the anonymous 911 caller's insufficient indicia in identifying the suspect, respectfully.

**Violation of Constitutional Right**

As instructed by the Court in Saucier, this court must "concentrate at the outset on the definition of the constitutional right and [then] determine whether, on the facts alleged, a constitutional violation could be found…." *Saucier, 533 U.S. at 207, 121 S.Ct. 2151*. Here, Palmer brings forth a claim that Officer Garcia Jr. used excessive force when he arrested him, thereby giving rise to a violation of his constitutional protection against unreasonable seizures under the 4th Amendment. This court has recognized a person's constitutional "right to be free from excessive force during an arrest…." *Minchella v. Bauman, 72 Fed. Appx. 405, 2003 WL 21957034, at *3 (6th Cir. Aug.13, 2003) (citing Graham v. Connor,*

*490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); see also Phelps, 286 F.3d at 300 (*indicating that when allegations of excessive force occur "during the course of the arrest of a free person, ... the parties' rights and liabilities are governed by the 4th Amendment's reasonableness standard").

This also includes a claim based on excessive force used in HANDCUFFING. *Walton v. City of Southfield, 995 F.2d 1331 (6th Cir.1993); see also Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir.2002) (*recognizing that "right to be free from 'excessively forceful handcuffing' is a CLEARLY ESTABLISHED RIGHT for QUALIFIED IMMUNITY purposes*"); Turek v. Saluga, 2002 WL 31119691, at (6th Cir. Sept.24, 2002) (citing Walton, 995 F.2d at 1342).* Appellate courts had previously held that "allegations of bruising and wrist marks [from handcuffs] create a genuine issue of material fact" that bar the granting of qualified immunity. *McGrew v. Duncan, 937 F.3d 664 (6th Cir. 2019).* Plaintiff Palmer would ask the court to reference **Plaintiff's Exh. A** at the end of the Petition; a picture of the damage caused by the excessive tightening of the handcuffs by Officer Garcia, Jr. Also, at **Defendant's Video Exh. A1 [06:43]** plaintiff can be heard repeatedly informing the officer of handcuff tightness and to 'please relax the tightness'. Officer reclaims that he did not intend on doing that at this time. He also mentions seconds later that he witnessed me speeding, which was impossible given his video evidence.

The Constitutional violation has been defined. Palmer walked out of his vehicle and soon after instructed him to return to his vehicle. Palmer inadvertently fails to follow this instruction, because a movement to or from the place of instruction could lead to further escalation by police; if police were to believe he is walking to his vehicle to obtain a weapon. Once Palmer realizes Officer Garcia Jr's presence, he remains standing still, while Officer Garcia, Jr. then attempts to knock him onto the ground and car by physically coercing him even though he was not a flight risk and, in fact standing waiting for Officer Garcia, Jr.'s questioning. Then, Officer Garcia Jr., along with Daniel Esquivel, shoved him onto the ground. Even though John Palmer was ready to turn around and assume the position of arrest, Officer Garcia, Jr. pushed his entire weight against Palmer's body. The officer then grabs and forces Palmer's arm behind him and, with harrowing amounts of tightness, fastens the handcuffs onto Palmer's wrists. Under the circumstances "[t]aken in the light most favorable to the party asserting the injury," *Saucier, 533 U.S. at 201, 121 S.Ct. 2151*, Officer Garcia Jr.'s overly aggressive actions could have violated Palmer's 4th Amendment right to be free from EXCESSIVE USE OF FORCE during an arrest.

**Precedence**

Even though Officer Raskin had Solomon's right arm handcuffed and even though Solomon was not actively resisting arrest, Officer Miller pushed his entire weight against Solomon's body. *Solomon v. Auburn Hills Police No. 03–1707 (appealed) (2004).* For the Court's information, reckless driving (along with similar offenses) can in fact be reduced to a lesser misdemeanor of Disturbing the Peace. This civil suit sets precedence to the plaintiff's and gives defending Officer Garcia, Jr. fair notice to his claims, such as is the reason for him using excessive force and alleging that the suspect resisted arrest, set forth after calls to emergency services in this civil action. It demonstrates excessive handcuff tightness.

**Constitutional Right Clearly Established**

In deciding if a right is Clearly established it must be determined "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Phelps, 286 F.3d at 299 (quoting Saucier, 533 U.S. at 202, 121 S.Ct. 2151) (internal quotations omitted).* "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham, 490 U.S. at 397, 109 S.Ct. 1865 (*emphasis added*).* Discerning reasonableness "requires a careful balancing of ... the individual's 4th Amendment interests' against the countervailing governmental interests at stake." *Id. at 396, 109 S.Ct. 1865 (*citations and internal quotations omitted*).* We must remember to consider the reasonableness of the officer at the scene, *id.*, and keep in mind that officers must often make split-second judgments because they are involved in

"circumstances that are tense, uncertain, and rapidly evolving," *id. at 397, 109 S.Ct. 1865*. "It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Saucier, 533 U.S. at 205, 121 S.Ct. 2151*. If an officer, therefore, makes a mistake as to how much force is required, he will still be entitled to qualified immunity so long as that mistake was reasonable. *Id*. Thus, to find that Officer Garcia, Jr. is shielded from his actions and therefore entitled to qualified immunity, it must be determined that Officer Garcia, Jr.'s use of force under the circumstances was objectively reasonable. In *Rice v. Morehouse*, the Ninth Circuit reiterated that, for purposes of clearly established law, "we clearly established one's 'right to be free from the application of non-trivial force for engaging in mere passive resistance.'" *989 F.3d 1112, 1125 (9th Cir. 2021*) (quoting *Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013)*) *(citing Nelson v. City of Davis, 685 F.3d 867, 881 (9th Cir. 2012)* (explaining that cases dating back to 2001 established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force")).

Plaintiff, acting pro se, asks the court to heed the following. To "pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Burchett, 310 F.3d at 944 (citations and internal quotations omitted)*. Claims against Plaintiff Palmer have already been dismissed from prosecution IOJ. In addition, we have also found that "the definition of reasonable force is partially dependent on the demeanor of the suspect." *Minchella, 2003 WL 21957034, at (*officers asserting that large plaintiff who refused to be arrested required more force*)*. In applying these considerations to the facts of the case presented earlier, it would be clear to any reasonable officer that the amount of force used against Palmer by Officer Garcia, Jr. was unlawful and unreasonable.

**Fair Notice**

In *Thompson v. Raheem, 885 F. 3d 582, 586 (9th Cir. 2018)*, the Ninth Circuit clarified that a qualified immunity defense to an excessive force claim is analyzed in three stages. In the first stage, the court assesses the severity of the intrusion by evaluating the type and amount of force inflicted. In the second stage, the court evaluates the government's interest by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape. In the third and final stage, the court balances the gravity of the intrusion against the government's need for the intrusion. *See also Williamson v. City of National City, 23 F.4th 1146 (2022)* (following same three-step analytical framework to analyze qualified immunity in excessive force claim):

First, Palmer was arrested for reckless driving. Therefore, "[t]he reasonableness of the Officer['s] actions must be weighed against this backdrop." *Minchella, 2003 WL 21957034*. The crime at issue here was a minor offense and certainly not a severe crime that would justify the amount of force used by Officer Garcia, Jr. For the Court's information, reckless driving (along with similar offenses) can in fact be reduced to a lesser misdemeanor of Disturbing the Peace. The amount and type of force can be viewed in Plaintiff's Exh. "A" and in Defense Video Exh. "A1". Second, Palmer posed no immediate threat to the safety of the officers or others. He was surrounded by no one on his way to Murphy's Gas Station convenience store and was seen standing still and calmly waiting for Garcia, Jr to identify and the reason for his stop. Palmer bore no weapon, nor did he conceal a weapon and he made no serious verbal threats against the officers. We must also consider the size and stature of the parties involved. Here, each of the officers stood at least five-feet-eight-inches tall and weighed between 230 and 300 pounds. By stark contrast, Palmer stood five-feet-ten-inches tall and weighed approximately 200 pounds. Under these facts, Palmer posed no immediate threat to the officers' safety. Finally, it is undisputed that Palmer did not attempt to flee. Palmer cooperated by standing by idly. He did not need to comply with any orders to return to his vehicle or render Identification before police stated their presence or the nature of their stop. In taking the facts as Palmer alleges, he did not resist arrest, instead he enacted an equal use of

force against the officer's excess use of force to remain standing. He was never told he was under arrest and instead was grabbed and told to calm down. The mere fact that he tried to remain standing from the Officer's persistent pushing, tugging, and slamming against the hood of his car does not create the presumption of actively resisting arrest that would justify Officer Garcia, Jr.'s actions. This demonstrates that the Officers' actions were in bad faith and decline a need for a governmental intrusion.

**Qualified Immunity** (see page 7)

Qualified immunity will often operate "to protect officers from the sometimes 'hazy border between excessive and acceptable force.' " *Saucier, 533 U.S. at 206, 121 S.Ct. 2151 (citing *175 Priester v. Riviera Beach, 208 F.3d 919, 926–27 (11th Cir.2000)).* An officer should be entitled to qualified immunity if he made an objectively reasonable mistake as to the amount of force that was necessary under the circumstances with which he was faced. *Greene v. Barber, 310 F.3d 889, 894 (6th Cir.2002).* The facts here, however, do not present one of those hazy cases. The dissent ignores that the officers here were not faced with a tense and uncertain situation where they feared for their safety and the safety of bystanders. *Saucier.* In fact, Palmer cooperated with the officers in that he did not flee or move from the position he realized police were in pursuit. It was at that point that Officer Garcia, Jr. began to act with unnecessary, unjustifiable, and unreasonable force. He first attempted to advise Palmer that he was reported recklessly driving. He did not question Palmer of anything or instruct him he was being placed under arrest. He did not possess an objective reason to do so. Officer Garcia, Jr.'s actions, in total, were excessive and resulted in Palmer suffering from bruising and scarring of his forearm. Palmer believes that intentional discrimination against him is what motivated all claims depicted above as well as the rest of claims, to this point. In viewing the facts in favor of Plaintiff Palmer, it can be concluded that no reasonable officer would have found that the circumstances surrounding the arrest of Palmer required the excessive use of force that was used here. Officer Garcia, Jr. is no exception. Because Officer Garcia, Jr.'s conduct was unlawful under the circumstances, he should not be able to escape liability through qualified immunity. Defendant Officer Garcia, Jr. is seen to have used EXCESSIVE FORCE in violation of 42 U.S.C. §1983 and Plaintiff's constitutional rights and plaintiff finds that the evidence weighs against the officer for lacking reasonable suspicion. Plaintiff requests that the Court stipulate.

**Monell Liability Theory**

1.  *Alejandro Guedea, Jr., LCC* and *Bane Doe Supervisor* acted under color of state law;
2.  the act[s] of *A. Garcia, Jr., A. Gonzalez,* and *John Doe police* deprived the plaintiff of his particular rights under 4th, 5th, 14th Amendments under the United States Constitution as explained in earlier instructions;
3.  *Bane Doe supervisor* acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant City of Eagle Pass; and
4.  the defendant City of Eagle Pass' official policy or widespread or longstanding practice or custom caused the deprivation of the plaintiff's rights by the Bane Doe supervisor; that is, City of Eagle Pass' official policy or widespread or longstanding practice or custom is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

**Scope**

For the purpose of this claim, qualified immunity analysis is irrelevant to the issue of liability under *Monell v. Department of Social Services of City of New York, 436 U.S. 658, 691 (1978). See Mendiola-Martinez v. Arpaio, 836 F.3d 1239, 1250 (9th Cir. 2016).*

In Monell, the Supreme Court held that a local government body cannot be held liable under § 1983 "solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id. at 691, 98 S.Ct. 2018.* Local governing bodies can be held liable, however, where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id. at 690–91, 98*

*S.Ct. 2018.* A state official may be sued in his or her official capacity under § 1983, but only for prospective injunctive relief. This is because "official-capacity actions for prospective relief are not treated as actions against the State." *Will, 491 U.S. at 71 n.10.* A state official may be sued under § 1983 in his or her individual capacity for damages. *See Gibson v. Graham, 473 U.S. 159, 165 (1985);* but *see Avalos v. Baca, 596 F.3d 583, 587 (9th Cir. 2010)* (holding that in order to be individually liable under § 1983, individual must personally participate in alleged rights deprivation). Although municipal liability for violating constitutional rights may arise from a single act of a policy maker, that act must come from one in an authoritative policy making position and represent the official policy of the municipality. [internal citations omitted]. Therefore, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *McGautha, 36 F.3d at 56 (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion)).* Whether a person is an authorized policymaker for purposes of assigning municipal liability is a question of state law. *See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); Jane Doe "A" v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990).*

Furthermore, a local government body can be held liable under § 1983 for policies of inaction as well as policies of action. *See Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1185–86 (9th Cir.2002).* In addition, use this instruction only when Monell liability is based on an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant that is alleged either to be itself unlawful or to direct employees to act in an unlawful manner. *See, e.g., Jackson v. Barnes, 749 F.3d 755, 763 (9th Cir. 2014).* A policy of action is one in which the government body itself violates someone's constitutional rights or instructs its employees to do so; whereas a policy of inaction is based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1143 (9th Cir.2012).* In inaction cases such as Plaintiff Palmer's, the plaintiff must show, first, "that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right." *Id.* (citations omitted) (internal quotation marks omitted). FIRST, this requires showing that the defendant "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id. at 1145* (citations omitted). SECOND, the plaintiff must show "that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Id. at 1143* (citations omitted) (internal quotation marks omitted). In addition, it is a fact that a supervisor may be subject to individual liability under section 1983 "if he directly [indirectly] participates in a constitutional violation." *Andrews, 98 F.3d at 1078.* This is true regardless of whether the supervisor is an authorized policymaker for purposes of municipal liability. *See id.* In other words, the Bane Doe supervisor need not be a final policymaker for the district in order to be subject to individual liability for actions that he himself performed. In *Allen* it holds that a pro se litigant's pleadings must be "liberally construed"), and adequately states a policy of inaction. *Allen v. Gold Country Casino, 464 F.3d 1044, 1048 (9th Cir.2006).* Under *Iqbal*, "bare recitation of the Monell elements fails to meet the pleading standard announced by the Supreme Court" in *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* mere legal conclusions "are not entitled to the assumption of truth." *Id. at 678–79, 129 S.Ct. 1937.* Rather, a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Id. at 678, 129 S.Ct. 1937 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).* "we continue to construe pro se filings liberally" when evaluating them under *Iqbal*, "particularly in civil rights cases." *Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir.2010).*

**Claims**

It is customarily TCOLE Model Policy for its police officer(s) to intervene, a duty to report excessive force, and duty to render aid or emergency services when injury is present. At all relevant times, Defendants A. Garcia, Jr., A Gonzalez, John Does, and Bane Doe supervisor were acting under color of law and under color of authority as police officers, employees, supervisors, and agents or subagents of the City of Eagle Pass, Texas and as actors of the State of Texas. It is believed that, without subpoena

information, none of the officers/supervisors present at the scene properly assessed the reason or lack of reasonable suspicion or whether use of force was required. The supervisor should have concluded that Officer Abel Garcia, Jr. did not even witness the suspect committing any of the alleged infractions prior to making contact and instructed officers to release the plaintiff from unlawful detention. Plaintiff wants to make perfectly clear to the court that officials in EPPD and the City of Eagle Pass corporation persons are enacting policies that empower officers to the extent that they are deliberately and with reckless indifference, harassing and with intent, casting bias against certain racial groups. While discriminatory intent need not be the only motive, a violation occurs when the evidence shows that the entity adopted a policy at issue "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)*. It is TCOLE policy requires Racial Profiling Reports to be submitted by Chief administrators of law enforcement agencies that meet the criteria outlined in Texas Occupations Code 1701.164 specifies that TCOLE collect incident-based data in accordance with the Code of Criminal Procedure Article 2.131 – 2.138. Each agency must file an annual online report by selecting and completing the reporting option that applies to their situation. Reports are filed online through TCLEDDS. The reporting period for the previous year begins on January 1st and ends March 1st. Plaintiff Palmer has reason to believe that excessive use of force and racial profiling report had not been compiled or issued to its proper authority (Palmer is awaiting Subpoena information).

**Failure to Supervise**

Through the defense Video Exhibits A1 and A2 it is clear that there were probably no supervisors on site, and this should constitute an indirect failure on the unknown supervisor's part to supervise its subordinates during events that can be plausibly considered racial profiling and unconstitutional. In Video Exhibit A1, Garcia, Jr. would have to agree that the 911 caller Esquivel clearly states that he witnessed suspect Palmer in a different place than the address he received via dispatch, initially. This can be construed as a habit that officer Garcia, Jr. blindly trusts unreliable indicia to arrest its suspects. FIRST, Plaintiff Palmer would like to propose that City of Eagle Pass was on constructive notice that this failure to supervise would likely result in a constitutional violation:  Palmer assumes (without the subpoena deuces tecum names and findings) that because none of the 5 police officers on site during the arrest reported to their immediate superior that an event of excessive use of force occurred that the Department and City should have known or knew (even if actual notice was not issued on supervisor and ultimately the City of Eagle Pass/Department) that this unconstitutional conduct was occurring due to multiple police officers not reporting force. The Doe supervisor indirectly is allowing this behavior within his/her ranks SECOND, this municipal policy of not habitually supervising its officers was the movant force that, had there been a policy in place of supervising its officers conducting Terry stops of majority members of the public, would not have, with reckless indifference, violated plaintiff's constitutional rights. Palmer asserts that this plausible policy was the cause of the constitutional violations plaintiff endured. Plaintiff asks the Court to continue to construe pro se filings liberally when evaluating them under *Iqbal*, particularly this civil rights cases, since the plaintiff is still awaiting information and police records in subpoena. To establish municipal liability under § 1983, the plaintiff must prove that (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Peterson v. City of Ft. Worth, 588 F.3d 838, 847 (5th Cir. 2009)*. Alas, an official policy can arise either in written policy statements and regulations, OR in the form of a pattern "that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson v. City of Ft. Worth*, 588 F.3d 838, 847 (5th Cir. 2009). "Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).

**Failure to Train**

"The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Price v. Sery, 513 F.3d 962, 973 (9th Cir.2008)*, quoting *City of Canton v. Harris, 489 U.S. 378, 388 (1989) (cleaned up)*. Plaintiff has requested these from the defendant regarding the police officer's training records. The plaintiff believes that there are deficiencies in multiple police officer's training records where the failure to train amounts to the deliberate indifference to uphold the rights of persons with whom they encountered. Particularly the majority, protected member they identified as a suspect. To delve into specifics, if multiple police officers have not received annual "racial discrimination training" or "a police officer refresher course", this could constitute deliberate indifference, in part, because all police officers develop a fraternal "brotherhood" that detests whistleblowing, and group-think ideology, preventing individuals from thinking for themselves and allowing them to implement their training directives and policies. Interpretations could yield different views as to how its police departments and officers train and recognize reasonable suspicion, exercise use of force, and, most importantly, that they are cognizant of internal & external locus of control and racial distinctions & discriminatory sensitivity.

**SUMMARY**

In determining whether defendant's Garcia Jr., John Does, OR Supervisor Bane Doe were properly trained concerning racial discrimination, proper supervision, and reporting use of force, the plaintiff finds defendants lack AFFIRMATIVE ACTION in policies and procedures. The plaintiff would ask that the Court determine through prima facie preponderance that the City of Eagle Pass, duly sworn Supervisor & Police Officers violated the MUNICIPAL MONELL LIABILITY THEORY under Section 42 U.S.C. § 1983.

---

# 14th Amendment

**Malicious Prosecution**

Defendant Police officer of Eagle Pass Police Department, one Abel Garcia, Jr., is seen to have violated Plaintiff's 14th amendment rights to be free from Malicious Prosecution.
The elements of a malicious prosecution claim are as follows:

(1) the commencement of a criminal proceeding by the defendant against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice.

*See Cruz–Caraballo v. Rodriguez. 113 F. Supp. 3d 484.*

Defendant Garcia Jr. 1) commenced a false criminal proceeding against Plaintiff of Resisting arrest in which charges were 2) since declined in favor of the accused in the best interest of justice (IOJ). 3) The unlawful arrest and all proceedings, therewithin, performed by the defendant were determined by plaintiff to have been performed with the absence of probable cause, warrant and, for lack of meeting minimal indicia from 911 caller, subsequently lack reasonable suspicion to conduct an arrest. This is supported by a notice to decline prosecution IOJ 4) The fabrication of findings found on Defendant's report (such as officer observing plaintiff Palmer speeding and actual location and timing 911 caller placed suspect at) along with excessive use of force and police-caller corroboration of indicia is believed to be in direct malum in se against the Plaintiff.

Defendant Officer Abel Garcia, Jr. is found to have violated Plaintiff's 14th Amendment right under 42 USC §1983 to be free from MALICIOUS INTENT AND PROSECUTION in the color of law and culpability. Plaintiff wants to stress to the court and jury that without the absolutely essential use of technology today in recording all police activities, all information given by Officer Garcia, Jr. could have led to an unlawful imprisonment of multiple other citizens, up to and including the plaintiff.

---

## 42 U.S.C. § 1981

### Intentional Racial Discrimination

#### Narrative

It would be crucial to ascertain at what point Officer Garcia, Jr. realized suspect was a white, Anglo-Saxon male or that he was a protected U.S. Veteran. However, the officer's subjective suspicions would have been satisfied in determining that the plaintiff was a white, Caucasian, or Anglo-Saxon male when he relayed plate information to dispatch or when he finally obtained his Driver's license with "Veteran" embolden on it. The officer does not indicate in his report when or if he received any information regarding Plaintiff's identifiers or a name, but his reasons for suspicion do not support a "reasonable inference" of criminal activity. *United States v. Sokolow, 490 U.S. 1, 7 (1989).* Defendant knew Plaintiff was a white male in a protected group at some point throughout the arrest process.

#### Precedent

*Loggervale* is analogous in precedence and gives fair notice to police officers that perceived racial animus motivated the defendants' actions and would not have amounted into an amalgamate of constitutional violations had the suspect been White/Hispanic in origin.

#### Scope

Plaintiff Palmer's race was a determinative factor in Defendant Garcia, Jr.'s decision to pursue and arrest plaintiff. Although Plaintiff Palmer must prove that the defendant acted with the intent to discriminate, plaintiff is not required to prove that defendant acted with a particular intent to violate plaintiff's federal civil rights. Moreover, plaintiff is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be perceived from the existence of other facts; particularly those facts already admitted and a need for the court to heed above. The defendants are seen to have initiated a malicious prosecution against the plaintiff in bad-faith and was deemed to be a policy initiated with reckless indifference as to the rights and well-being of an Anglo-Saxon, non-Hispanic citizen. Any reasonable police officer would have been aware of the implications given the relatively low levels of objectivity in facts and evidence received prior to searching for a suspect. Furthermore, pretext from a similar, favorable civil rights suit shows the plaintiff's attorney coincided that a reasonable jury could conclude that similarly situated white women would not have been investigated or unlawfully searched, as were the Loggervales. In other words, a reasonable jury could conclude that racial animus motivated defendants' actions (*Holland Decl. ¶¶ 13–21, 25;* see, generally, *Pope Decl.* discussed in *Loggervale v. Alameda County, (Cause # 3:20-cv-04679-WHA);* e.g., *Brewer v. Bd. of Trs. of Univ. of Ill., 479 F.3d 908, 921 (7th Cir. 2007)* (It was made known during the terry-stop that the Loggervale's were an Ivy-league, all-female in the car, black family. The deference successfully hit home and reflected upon District Judge William Allsup).

Article 42 U.S.C. § 1981 prohibits race discrimination against whites as well as nonwhites. *See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295 (1976)* (Section § 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In *Runyon v. McCrary, 427 U.S. 160 (1976),* the Supreme Court held that Section § 1981 regulated PRIVATE CONDUCT as well as GOVERNMENTAL action. Rather, a plaintiff must raise a claim under §1983 to remedy a State actor's 1981 violation. *Oden v. Oktibbeha Cnty., 246 F.3d 458, 463 (5th Cir. 2001).* Discriminatory Intent is required to support a claim under Section § 1981. *Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989)* (holding that Section § 1981 requires discriminatory intent and that the burden-shifting framework set by *McDonnell Douglas v. Green [Title VII], 411 U.S. 792 (1973),* applies to Section § 1981 claims [as well]). *See* also *Goodman v. Lukens Steel Co., 777 F.2d 113, 135 (3d Cir. 1985)* (Section § 1981 requires a showing of intent to discriminate on the basis of race); *Stehney v. Perry, 101 F.3d 925, 937 (3d Cir.1996)* ("[A] facially neutral policy does not violate equal protection solely because of disproportionate effects" because Section § 1981 provides a CAUSE OF ACTION "for intentional racial discrimination only.")

If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate nondiscriminatory reason for the challenged [governmental] action. *See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506–07 (1992)*. In *Smith v. Borough of Wilkinsburg, 147 F.3d 272, 279 (3d Cir.1998)*, the court held that the question of whether the defendant has met its intermediate burden of production under the McDonnell-Douglas test is a "threshold matter to be decided by the judge."

In the case *Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 34 2001)* ("Although claims against individual supervisors are not permitted under Title VII, This court has found individual liability under § 1981 when the defendants intentionally cause an infringement of rights protected by Section § 1981, regardless of whether [Eagle Pass Police Department or City of Eagle Pass] may also be held liable."); *Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986)* ("employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section §1981, regardless of whether the corporation may also be held liable"). Accordingly, the instruction modifies the instruction used for Title VII hostile work environment claims, to specify that individual employees can be liable for acts of racial harassment. Cognizant of the facts above, the plaintiff will place the Bane Doe supervisor's direct or indirect actions into culpability for a policy the plaintiff will extrapolate in further detail in the Monell Theory section below.

In *St. Francis College v. Al-Khazraji, 481 13 U.S. 604, 609-10 (1987)*, the Court considered whether a person of Arab descent was entitled to the protections of Section § 1981. Defendants argued that the plaintiff was a Caucasian as that term is commonly understood in modern usage. But the Court found that the question of race had to be determined by reference to a different time period, i.e., the 19th Century, when Section § 1981 was enacted. "Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time §1981 became law." *Id.* The Court elaborated on the proper inquiry as follows: In the middle years of the 19th century, dictionaries commonly referred to race as a "continued series of descendants from a parent who is called the stock," N. Webster, An American Dictionary of the English Language 666 *(New York 1830) (emphasis in original)*. Encyclopedias of the 19th century also described race in terms of ethnic groups. *Encyclopedia Americana* in, Last updated August 2020, *1858*, for example, referred to various races as ethnic groups. These dictionary and encyclopedic sources are somewhat diverse, but it is clear that they do not support the claim that for the purposes of § 1981, Arabs, ENGLISHMEN, Germans, and certain other ethnic groups are to be considered a Single race. We would expect the legislative history of § 1981, to reflect this common understanding, which it surely does. The debates are replete with references to Latin, *id., at 238* (remarks of Rep. Kasson during debate of home rule for the District of Columbia), SPANISH, *id., at 251* (remarks of Sen. Davis during debate of District of Columbia suffrage), and ANGLO-SAXON races, *id., at 542* (remarks of Rep. Dawson). MEXICANS, *see ibid*. (remarks of Rep. Dawson. While the line between race and national origin may in some cases be vague, it must be remembered that the Court in St. Francis College intended that the term "race" be applied broadly. Thus, in *Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 617-18 (E.D. Pa. 1999)*, the court declared that "for purposes of Section § 1981, race is to be interpreted broadly and may encompass ancestry or ethnic characteristics." as they are not actively incorporating those practices into their disciplines. Generally, intentional discrimination happens when the recipient acted, at least in part, because of the actual or perceived race, color, or national origin of the alleged victims of discriminatory treatment. *Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 548 (3d Cir.2011)*.

The defendant and many other officers like him are being treated with impunity for their unmonitored violations. Plaintiff also believes that officers are not being disciplined for their malicious motives against suspects. Some assume that the intentional use of race should be carefully scrutinized only when the intent is to harm a group, or an individual defined by race, color, or national origin.

That is not true: the Supreme Court in *City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989),* and *Adarand Constructors, Inc., v. Pena, 515 U.S. 200, 226 (1995),* established that any intentional use of race, whether for MALICIOUS or benign motives, is subject to the most careful judicial scrutiny. Accordingly, the record need not contain evidence of "bad faith, ill will or any evil motive on the part of the [recipient]." *Williams v. City of Dothan,* 745 F.2d 1406, 1414 (11th Cir. 1984).

**Statistics-based Factual**

Based on the theory of reverse discrimination (*Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995)* (Thirty-four percent of the race discrimination cases decided by the Court during the first five years of Chief Justice Rehnquist's term were asserted by whites. This increase may be due to a perception on the part of whites that the Court is friendly toward reverse discrimination claims. *Brian K. Landsberg, Race and the Rehnquist Court, 66 Tul. L. Rev. 1267, 1275 (1990)),* figures and statistics polled on arrests made on Black, non-Hispanic Latino, or white, Hispanic males or females residing in an area with majority white, Caucasian (etc.) officers, could be equally reciprocated to reflect white (Caucasian, etc.) males or females arrested residing in an area with majority Black and/or Hispanic/non-Hispanic officers. In 2020, officers nationwide submitted information and evidence to FBI's NIBRS database with interesting statistics surrounding racial- and gender-based arrest patterns:

Arrestees

Law enforcement agencies submitted data to the UCR Program through Incident reports and Arrest reports for 3,621,299 arrestees.

- Of these arrestees, 31.9% were 26 to 35 years of age.
- By gender, 72.6% were male; and 27.4% were female.
- By race, most arrestees (67.7%) were white; 27.1% were Black or African American; and 2.9% were of other races. The race was unknown for 2.2% of arrestees.

There is an omission in the FBI's arrestee information I would like to discover. If one would look at most states and [FBI statistics] Hispanic is not considered a racial category, and only some ask about Hispanic ethnicity. This makes it impossible in some states to know or even estimate the actual arrest figures by race. Due to this omission, Federal Bureau of Investigation crime statistics are not complete when it comes to Hispanic offenders. Similarly, the Federal Bureau of Prisons has combined white statistics but does not distinguish between Hispanic/non-Hispanic arrestees and white Caucasian/Anglo-Saxon arrestees. Fortunately, the Department of Justice does make the distinction. Please see DOJ or FBI databases. According to DOJ estimates from a 2018 statistical report, approximately 17.6 percent of people are Hispanic in origin. 45.9 percent were non-Hispanic white races as per DOJ. Furthermore, if we take that 2018 DOJ stat of 17.6% of federal-only Hispanic white prisoner probability and subtract it from the 2020 FBI NIBRS-UCR arrestee probability of 67.7% white, we obtain 50.1% are Anglo-Saxon, etc. non-Hispanic white arrestees. Defendant Abel Garcia, Jr. is presumed to be of Hispanic origin. Plaintiff Palmer's racial composition relinquishes in front of the court that he is mixed of 2 races; white Anglo-Saxon and non-Hispanic Latino.

**Standard Deviation Test figures & 4/5ths Rule**

SD = √ [ (# of Minority Police / # Total Police) x (# of Nonminority Police / # of Total Police) x Police Arresting Suspect]

The plaintiff believes that this equation is zero standard deviations (or equivalent to 100% minority police) for minority police officers at scene arresting an Anglo-Saxon suspect with reckless disregard for his constitutional rights. This is guesswork at this point, but Palmer has reason to believe that out of the ~300 police force for Eagle Pass Police Department gathered from their website, none are of Any other race diversity. Even if there were, for example, 1 majority police officers working for EPPD,

with 5 minority officers at the scene, the SD would equal ~.1289, where 1 SD = 97%, 2 SD = 95%, etc. Therefore, there are a perceived ~99% of minority police officers arresting a majority white suspect.

The Disparate Impact 4/5ths Rule is a guideline used to determine if there is adverse impact in the process of [arresting] a specific group. The rule states that the [arrest] ratio of a minority group should be at least one-fifths (20%) of the [arrest] ratio of the majority group, with 20% being Majority group that can be applied to Reverse Discrimination claims. *29 C.F.R. §§ 1607.4(D), 1607.16(B).*

EPPD is seen to exhibit no signs of tokenism within its department.

**Business Necessity Defense**

Federal title VII provides that while business necessity is a defense to a claim of disparate impact discrimination, "[a] demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination." *(42 U.S.C. § 2000e-2(k)(2); CACI No. 2504, Disparate Impact - Rebuttal to Business Necessity/Job Relatedness Defense)*

**Bona-Fide Occupational Qualification**

There is no BFOQ defense in racial discrimination cases. *42 U.S.C. § 2000e-2(e)(1). See 7 Ferrill v. Parker Group, 168 F.3d 468, 475 (11th Cir.1999) (no BFOQ defense to race-matched 8 telemarketing or polling).*

**TCOLE – Racial Profiling Report**

It is Texas Commission on Law Enforcement policy requires that a Racial Profiling Report be submitted by Chief administrators of law enforcement agencies that meet the criteria outlined in Texas Occupations Code 1701.164 specifies that TCOLE collect incident-based data in accordance with the Code of Criminal Procedure Article 2.131 – 2.138 . Plaintiff believes this report was not furnished and would like to inquire as to whether this arrest concerning the racial profiling was reported by city admin officials to TCLEDDS.

**SUMMARY**

Ultimately, after considering Standard Deviation and various statistics figures on arrest patterns, Plaintiff Palmer believes that defendant Garcia, Jr. INTENTIONALLY DISCRIMINATED against him based on perceived racial-diversity and malicious prosecution preponderance of evidence and further violated his Constitutional civil rights in accordance with 42 U.S.C. §1981. The plaintiff requests the Court that the burden be shifted towards defendant in prima facie form.

---

## STATE CLAIMS

**Statute of Limitations**

In Texas, the statute of limitations is (2) years for personal injury claims. Claim accrues when plaintiff knew or should of known of her (his) injury. *Serino v. Hensley, 735 F.3d 588 (7th Cir. 2013).* The plaintiff first knew of the injuries depicted on **07-04-2021** during the arrest incident. Plaintiff's petition was first submitted in state district court on **06-2023.**

**Equitable Tolling**

The plaintiff seeks the benefit of equitable tolling to preserve [his] claims. *See Br. Supp. Resp. Mot. Dismiss 9 (citing Stoll v. Runyon, 165 F.3d 1238 [9th Cir. 1999]).* "The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." *United States v. Patterson, 211 F.3d 927, 930 (5th Cir. 2000).* Application of equitable tolling is a question of fact that turns on the circumstances of a particular case. *See Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999) ("As a discretionary doctrine that turns on the facts and circumstances of a particular case, equitable tolling does not lend itself to bright-line rules, but we draw on general principles to guide when equitable tolling is appropriate.")* Thus, plaintiff respectfully asks the Court that equitable tolling be

applied and allowed where necessary to meet the plaintiff's claims as he has already met the burden of stating a valid claim and submitting petition within state law. Reasonable accommodations were made to timely obtain counsel, with no avail.

**CLAIMS**

**Assault and Battery**

"As a general rule, members of the public have no constitutional right to sue [public] employees who fail to protect them against harm inflicted by third parties." *Juan Hernandez v. City of San Jose*, *897 F.3d 1125, 1133 (9th Cir. 2018) (quoting L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir. 1992)).* One exception to this general rule is the state-created danger doctrine. Under this exception, a government employee must have affirmatively placed the plaintiff in a position of danger, that is, the employee's actions must have created or exposed an individual to a danger that he or she would not have otherwise faced. *Id*. To prove that the exception applies, "[t]he affirmative act must create an actual, particularized danger," "the ultimate injury to the plaintiffs must be foreseeable," and "the employees must have . . . acted with 'deliberate indifference' to a 'known or obvious danger.'" *Id*. (citations omitted). For a further discussion of the state-created danger doctrine, *see also Bracken*, 869 F.3d at 778-79; *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016). Bearing in mind Daniel Esquivel's arrival timing and the actions immediately following the arrest, he can be seen in **Defense Video Exh. A1** using force against an innocent bystander. Officer Garcia, Jr. was in a direct position to augment or prevent the situation by instructing an anonymous person (at the time of arrival Esquivel's identity was not yet known by the officer) not to assist in arrest and instead be standby. For reference, the district court argued "that *any* use of force was unreasonable, because it was unreasonable to ask (Oakley) to leave in the first place." *Oakley, 2020 WL 818920, at *14* (emphasis in original). Moreover, "Because of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." *Holland v. City of Poughkeepsie, 90 A.D. 3d 841, 844, 935 N.Y.S.2d 583 (2d Dept. 2011); See, e.g., Hernandez v. Denny's Corp., 177 A.D. 3d 1372, 1375, 114 N.Y.S. 3d 147, 152 (4th Dept. 2019).* This is an example of guards [e.g., Daniel Esquivel as third-party] and police officers using an unnecessary amount of force and then giving information leading to the arrest of a citizen [plaintiff] when the seriousness of the offense alleged by the third party was minimal to bystanders. Given that no accidents, injuries, or deaths occurred at suspect Palmer's alleged direction and destination, this gives even less weight to defendant's claims, at the time.

The amount of force used to citizen's arrest the plaintiff is now considered simple assault and battery in accordance with TX. Pen. Code, Sec. 22.01. In *Oakley,* he alleged that "the security guards clearly exceeded the bounds of reasonable behavior and instigated a physical altercation where there otherwise was no need for such violent conduct," *Oakley v Dolan* ¶ 43. He also alleged that the MSG Defendants "intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct," *id.* ¶ 123, and that they "intentionally and wrongfully physically contacted Plaintiff without his consent," *id.* ¶ 127. Plaintiff was ASSAULTED AND BATTERED by Daniel Esquivel without cause and all prosecution since has been dismissed IOJ.

**False Arrest and Imprisonment**

Detention may be accomplished by violence, threats, or any other means that restrains a person from moving from one place to another. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 645 (Tex. 1995). The false information given to Officer Garcia, Jr. by Daniel Esquivel sways from the definition found in TX Pen. Code 9.51 stating that Arrest and search is allowable by police officers to the degree of force they deem necessary provided they have objective reason to. Garcia, Jr. should have notified Esquivel promptly that no force on his part was necessary. Accordingly, liability for false imprisonment may extend beyond those who actually do the detention to those who request or direct the detention, specifically the false information, along with his False Arrest and Assault and Battery, given by defendant

Daniel Esquivel. This is sometimes referred to as "instigation" of false imprisonment which requires proof that the Defendant clearly directed or requested an officer carry out the arrest. *Wal-Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d. To hold a third party liable for instigating the detention through an unlawful arrest by a police officer, the arrest must be made by an officer, not of his or her own volition, but to carry out the request of the defendant. *Id.* The giving of inaccurate information to law enforcement authorities to prompt an arrest is not a basis for liability, but a third-party can be held liable for FALSE IMPRISONMENT for knowingly providing false information to law enforcement resulting in an arrest. *Id.* at 509 - 510. We let the Court decide Esquivel's culpability.

 Texas Penal Code § 20.02(a) protects Plaintiffs against FALSE ARREST AND IMPRISONMENT and states a person commits an offense if he intentionally or knowingly restrains another person. The elements of a False Imprisonment claim in Texas are: 1) willful detention; 2) without consent; and 3) without authority of law. *Wal-Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex. 2002); *Sears, Roebuck & Co. v. Castillo,* 693 S.W.2d 374, 375 (Tex. 1985). 1) Any conduct that was intended to cause the detention of another, and in fact caused the detention, may satisfy the first element of the false-imprisonment claim. *Rodriguez,* 92 S.W.3d at 507; 1) Being willfully detained, 2) Plaintiff Palmer did not consent to a detention or seizure of property; and 3) Officer Garcia, Jr. did not have authority under the Color of Law to perform even a routine Terry-stop.

**Negligence** (Gross Negligence)

 Negligence per se is a tort concept recognized in Texas whereby the civil courts adopt a legislatively imposed standard of conduct defining the conduct of a reasonably prudent person. *Moughon v. Wolf, 576 S.W.2d 603, 604 (Tex. 1978).* Negligence per se is proven by showing, among other things, that the defendant violated a statute for which tort liability may be imposed, without excuse, and that the act in violation of the statute proximately caused the plaintiff's injury. *See Perry v. S.N., 973 S.W.2d 301, 305 (Tex. 1998).* Many times, a violation of a criminal statute is the basis for the negligence per se claim. All persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so, but this is not equivalent to a duty in tort. *Perry* at 304. The threshold questions in negligence per se cases are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Id.* at 305.

 Moreover, the courts will not apply the doctrine of negligence per se if the criminal statute does not provide an appropriate basis for civil liability. *Id.* at 304. However, even if these threshold questions can be answered affirmatively, there are additional factors the Texas Supreme Court believes courts need to consider in deciding whether to apply a specific statutory requirement to a particular claim such as: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute. *Perry v. S.N., 973 S.W.2d at 309.*

 Plaintiff Palmer would wish that the Court not apply the negligence per se doctrine, because defendant Esquivel, along with defendant police officer's actions and inactions, combining their omissions with statutory requirements outlined below, have escalated damages to gross negligence territory. Palmer believes that he, as an actor, would not be recompensed damages if he only applied Esquivel's actions, even if in bad faith, as actions to which a reasonable person would be believed to be considered negligent in performing them.

 Gross Negligence legal term found in *Civ. Prac. & Rem. Code, Tit. 2, Subt. C, Ch. 41, Sec 41.001 (11)* defines "Gross negligence" as an act or omission in which *(A)* when viewed objectively from the

standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others and *(B)* of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious INDIFFERENCE to the rights, safety, or welfare of the Plaintiff.

Esquivel is seen to have proceeded with reckless indifference as to the wellbeing of the plaintiff in that he was not cognizant of the indicia requirements when calling anonymously to 911 and police. A reasonable person would have known that [s]he does not possess a right to citizen's arrest a person, violating their 4th amendment rights, and placing themselves and the plaintiff in potentially escalating danger. In *Oakley,* he alleged that "the security guards clearly exceeded the bounds of reasonable behavior and instigated a physical altercation where there otherwise was no need for such violent conduct," *Oakley v Dolan* ¶ 43. Esquivel proceeded to assault and battery, with GROSS NEGLIGENCE, Palmer with indifference as to his wellbeing, and Police officer Garcia, Jr. allowed it. A reasonable person would not have interfered in police affairs unless police officer requested help after his attempt to constraint a suspect fail, for example. Plaintiff wishes to recover non-economic and punitive damages.

## Intentional Infliction of Emotional Distress (IIED)

The tort of IIED has four elements: (1) the defendant must act intentionally or recklessly; (2) the defendant's conduct must be extreme and outrageous; and (3) the conduct must be the cause (4) of severe emotional distress. *Hyatt, 943 S.W.2d at 297.* Although case law does not provide us with a precise definition of "extreme and outrageous," the test adopted by courts for actionable conduct is that the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement (Second) of Torts section 46 cmt. d (1965).* The defendant's conduct must be more than malicious and intentional; and liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions. *Viehweg v. Vic Tanny Intern. of Missouri, Inc., 732 S.W.2d 212, 213 (Mo.App.1987).* "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery...." *Restatement (Second) of Torts section 46 cmt. h (1965).* The court must determine whether an average member of the community upon learning of the facts alleged by plaintiff would exclaim "outrageous!" *Viehweg, 732 S.W.2d at 213.*

Plaintiff requests a prima facie case be brought upon the defendant Daniel Esquivel for alleged violations cited above. The infliction of force was so excessive and negligent in citizen's arrest events shown in **Defense Video Exh. A1**, that it places into question the very fabric, the essence, of why there was a need to place a bystander under arrest for the safety of members in society. Esquivel's conduct should be considered gross negligence, and he should have known his actions were unnecessary in detaining a bystander. Garcia, Jr. and Daniel Esquivel together could not surmount the implausible alibi they created of a bystander and driver they believed, without the proper indicia of evidence required to perform an arrest, adding to the heap of stress and traumatic ideation created in this arrest scenario. It is clear that at the time and in retrospect, the defendant caused the victim emotional distress in a manner severely disregarding Palmer's person that one could only expect this escapade to adversely affect mental health. The result of the unlawful arrest is so purposefully recklessly in abandonment and grossly negligent of Palmer's God-given rights that the plaintiff believes the facts unequivocally proves through preponderance of the evidence the guilt of the defendant, causing plaintiff to toil for years from defendants IIED.

## Libel

Libel is defamation expressed in written or other graphic form that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation. Pursuant to *Civ. Prac. & Rem.*

*Code, Tit. 4, Ch. 73, Subt. A., Sec. 73.001*, plaintiff's reputation, and integrity, in light of Daniel Esquivel's statements to dispatch and to Officer Garcia, Jr. have been damaged. The arrest event may have damaged Plaintiff Palmer's ability to procure employment. Esquivel is documented in having reported a vehicle with a limited amount of indicia in identifying the vehicle simply as being white in color and a partial license plate number. Esquivel does not follow or confirm a person's name, his or her description, make or model of a vehicle to dispatch officers but instead indicates that the white vehicle was seen recklessly driving. Esquivel is seen in **Defendant's Video Exh. A1**, and not in **A2**, showing up to the Terry-stop scene moments after Officer Garcia, Jr and Palmer made contact. Palmer considers the false information rendered to the police afterwards, stating that he saw the vehicle at a different area (Peter Piper Pizza ~400 S. Bibb Ave) than where he initially claimed he witnessed vehicle in calls to 911 service.

In civil suits for libel recovery is given "in pecuniary satisfaction for the loss of character and reputation". *Belo v. Fuller, 84 Tex. 450, 453, 19 S.W. 616, 618, 31 Am. St. Rep. 75*. Other authorities hold that injuries affecting the reputation are the subject of the action for libel and that the general damages recoverable in civil suits for libel are in compensation for injury to the plaintiff's reputation. *Terwilliger v. Wands, 17 N.Y. 54, 72 Am. Dec. 420*. Plaintiff holds common law as a strong basis for definition on an already clear and concise depiction of what libel and defamation per se are and would like the court to consider that what the defendant was claiming was and is fictional aimed at damaging a then defendant Palmer's integrity in the eyes of the court. Appease the court, plaintiff would like to find defendant Esquivel guilty of LIBEL and that Punitive, Speculative, and Compensatory defamation damages be awarded in kind.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED Plaintiff respectfully requests this Court:

A.    Enter judgment in favor of Plaintiff and against Defendants; Enter an order declaring Defendant Garcia, Jr.'s, A Gonzalez, and John Doe's conduct unconstitutional;

B.    Award plaintiff Compensatory damages [Economic damages to include loss of earning capacity (i.e. back- and front-pay); Noneconomic damages to include non-pecuniary damages (i.e. emotional/mental anguish, loss of companionship, pain & suffering, embarrassment, and humiliation.)]; Exemplary damages (if allowed); Speculative defamation damages (libel); and Punitive damages (42 U.S.C. § 1981 & Malicious Prosecution) in accordance with state civil law infractions TX Civ. P & Rem. Code Ch. 41, Sec. 2 & 3. Plaintiff is humbly requesting $20 million in the matter if settled out of court with the Defense Attorney; If Defense attorney does not settle through mediation at the plaintiff's desired request, he is requesting $45 million in the matter.

C.    Award Pro Se Plaintiff reasonable attorney's fees and expert fees and costs pursuant to 42 U.S.C. § 1988 (b, c) and 42 U.S.C. § 1981, respectively, and any other applicable provisions of law;

Note:  Be advised, there are several courts that have permitted pro se attorneys to recover reasonable fees under Section § 1988. Serving as a basis for the Plaintiff requesting attorney's fees is the fact that he has searched through multiple states' referral program as well as browsed through approximately 100 private attorneys nationwide in search of a Civil Rights and civil litigation attorneys, with no success. The reason being they are either inexperienced, refusal to enter a privileged relationship, or failure to return phone calls as agreed;

D.    Enter a permanent injunction requiring Defendant City of Eagle Pass to adopt appropriate policies related to the hiring and supervision of its police officers; and

E.    Removal of all Defendant Officers from their positions; and

F.      Grant to Plaintiff such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States and Texas Constitution as to all claims for damages.

WHEREBY SIGNED and is respectfully submitted by,

John J Palmer

Pro Se Litigant
U.S. Navy Veteran
3427 Tina Dr.
Eagle Pass, TX 78852
(830) 281-0567 Telephone

John.J.Palmer2@Outlook.com

X _____
John Palmer
Pro Se

11-28-2023

X _____
Notary Public

RICARDO PEREZ
My Notary ID # 129457238
Expires June 28, 2025

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy, from aforementioned Plaintiff John J Palmer, of Order on Amended Petition was properly served by Email and Certified & Return Service mail upon the following Defendant(s) to District Clerk:

| Office of the Attorney General | Patrick C. Bernal | Daniel Esquivel |
|---|---|---|
| 300 W. 15th Street | Clarissa M. Rodriguez | 2962 Michigan Dr |
| Austin, TX 78701 | Counsel for Defendants | Eagle Pass, TX 78852 |
| | 2517 N. Main Ave. | |
| | San Antonio, TX 78212 | |

Eagle Pass Police Department
To: Officer A. Gonzalez
Attn: Frederico Garza
489 S. Monroe St.
Eagle Pass, TX 78852

Respectfully submitted,

John J Palmer